SHADY ACRES NURSING HOME, INC., ET AL., APPELLEES, *v.*
CANARY ET AL., APPELLANTS.

(No. 73AP-202—Decided November 13, 1973.)

48

*Messrs. Lucas, Prendergast, Albright, Gibson, Brown & Newman,* for appelles.

*Mr. William J. Brown,* Attorney General, and *Mr. Kevin F. Duffy,* for appellees.

TROOP, P. J. This appeal is from a judgment of the Franklin County Court of Common Pleas, filed April 24, 1973, which contains three basic orders, which are, briefly stated, as follows:

(1) That each of the defendants, Robert B. Canary, director of public welfare for the state of Ohio, the state auditor, and the state finance director, are permanently enjoined from decertifying and terminating payments to the plaintiffs, and others of the same class, providing skilled nursing home services to certain indigent persons qualified to receive medical aid under Social Security legislation, until the plaintiffs are provided a due process hearing;

(2) That defendant Canary is required to continue the classification to which the plaintiff, skilled nursing homes and medicaid patients, was assigned on July 27, 1972, and to continue to pay daily rates to the homes as required by law to be paid for each qualified patient until proper cause has been proved for decertifying and discontinuing payments, in a proper evidentiary hearing;

(3) That defendant Canary is required to recertify and reinstate any skilled nursing home certified prior to July 27, 1972, and pay retroactively sums due for services provided qualified medically indigent persons subsequent to the unlawful decertification and termination of payments.

Defendants, the appellants herein, support the appeal from that judgment of the trial court urging eight formal assignments of error, reference to which will be made in the discussion. Each assignment of error may have a distinct point to make, emphasizing a certain facet of the appeal, but the basic concern, upon which the most emphasis has been placed by the defendants, is the holding of the trial court that the director of public welfare may not decertify an operating nursing home supplying skilled nurs-

ing service, and summarily suspend or reduce the payments made for the services, without a prior evidentiary hearing. Of less concern, perhaps, but still strongly pressed, is the claim that the trial court erred in ordering retroactive payments for nursing services rendered to the qualified medically indigent persons after decertification occurred.

The eight formal assignments of error presented by the Attorney General on behalf of the defendants-appellants are addressed in total, and in detail, to the conclusions of law set out in the decision of the trial court, filed April 12, 1973, and included in its journal entry, filed April 24, 1973. There may be merit in discussing the assignments of error, and the conclusions of law of the trial court, in the order presented, but the nub of the appeal here to be resolved lies in assignment of error number six, which reads as follows:

"The court erred in ruling that the defendant, Robert B. Canary, must comply with the hearing and notice requirements of Chapter 119, Revised Code, in connection with canceling or refusing to renew provider agreements with skilled nursing homes."

The more elaborate statement of the question here for review is found in the trial court's conclusion of law numbered six.

That this review is limited to the concerns of the skilled nursing homes, plaintiffs herein as representatives of a class, is indicated by the agreed entry, filed October 5, 1972, in which the defendants were permanently enjoined "* * * from suspending, reducing or terminating payments made to any nursing home on behalf of any individual Medicaid recipient or recipients residing in such nursing home and certified or classified or found by the state of Ohio to be in need of skilled nursing care * * * until after the said individual Medicaid recipient or recipients, if residing in such nursing home, have been afforded a prior evidentiary due process hearing."

Such agreed entry reflects the trial court's conclusion of law numbered one, which is predicated upon the decision

of the United States Supreme Court in *Goldberg* v. *Kelly* (1970), 397 U. S. 254 (note paragraph six of the syllabus). The noted agreement of the parties leaves the necessity for a hearing with regard to the status of the skilled nursing homes as the major problem for review, but it also brings within the scope of the unresolved matter the conclusion of law of the trial court numbered two, to the effect that:

"* * * the suspension, reduction or termination of such payments without affording a prior evidentiary hearing to the nursing home has the effect of indirectly suspending, reducing or terminating payments to the Medicaid recipient without a prior evidentiary due process hearing."

It should be noticed that in *Goldberg* the state of New York did, or was about to, terminate direct payments for aid to dependent children under its home relief program, a federally assisted program.

A starting point for this discussion is a bit elusive, but it is noted that the concern is with regard to "skilled nursing homes," referred to hereafter as SNH. Of some significance, also, is the fact that these homes are "licensed." Statutory provisions for licensing are found in R. C. Chapter 3721. The Ohio director of health is the licensing authority. (R. C. 3721.02.) Licenses can be renewed annually. (R. C. 3721.05.) The denial of a license is a ground for an appeal in accordance with the provisions of R. C. 119.01 *et seq.*

A license is frequently defined as permission to do some act without which the act would be illegal. A license is not a contract, nor does it constitute property in a constitutional sense. It does not confer an absolute right, and governmental authority can impose new burdens, create additional burdens, or revoke the license. (34 Ohio Jurisprudence 2d 355, Licenses and Permits, Section 2.) Nursing homes of all kinds, including a SNH are licensees.

An extremely important facet of the problem here for consideration arises out of the compelling fact that federal funds are available to states in public welfare areas and that the resulting necessity of compliance with federal con-

trols and requirements, to say the least, complicates the work of the state administrative department. An examination of the publication of the U. S. Department of Health, Education and Welfare (HEW), titled "Compilation of Federal Regulations for Skilled Nursing Home Facilities," indicates that in the medicaid program here involved, HEW will deal only with a "single state agency."

The Ohio General Assembly enacted R. C. 5101.51, effective November 14, 1969, titled "Medical assistance program for recipients of aid, contracts for services." It reads, as follows:

"The department of public welfare may provide medical assistance to recipients and potential recipients of aid under Chapters 5105., 5106., 5107., and 5151. of the Revised Code through a single medical assistance program, as long as federal funds are provided for such assistance. Such assistance shall be administered by the agency or agencies charged with administration of aid under Chapter 5105. of the Revised Code. Expenditures for medical assistance shall be made from funds appropriated to the department of public welfare for public assistance subsidies. Any such program shall conform to the requirements of the 'Social Security Act,' 49 Stat. 620 (1935), 42 U. S. C. 301, as amended."

It seems clear that in response to the desire of HEW to deal with a "single agency" the legislature designated the department of welfare, and this was done notwithstanding the authority of the department of health in the issuance of licenses to nursing homes. The department of health continues to inspect nursing homes to determine compliance with Subchapter XIX requirements of the Social Security Act. The arrangement seems to be mutually satisfactory to both departments.

A communication addressed to SNH administrators, under the date July 1971, provides some clues to procedures and requirements relative to SNHs. The introductory paragraph reads:

"* * * This letter provides you with information on new policies and procedures concerning the responsibili-

ties of the Ohio Department of Health and the Ohio Department of Public Welfare for approval of Skilled Nursing Homes for participation under Title XIX of the Social Security Act."

The letter continues and spells out the additional requirements necessary for a nursing home to qualify under Subchapter XIX, over and above those which are necessary under Subchapter XVIII of the Social Security Act. The announcement is specific also as to the time span of an agreement with the deficient home. It reads:

"* * * No more than two successive six-month agreements will be executed with any skilled nursing home having deficiencies. The second of these agreements will not be executed if any of the existing deficiencies are the same as those which occasioned the prior agreement, unless the single state agency finds that the facility has made substantial effort and progress in correcting such deficiencies. This finding will be based on documented evidence derived from a survey."

Reference then follows respecting "an appeal mechanism." It reads:

"* * * After discussion with various nursing home organizations and individual administrators, it is apparent that an appeal mechanism should be established when deficiences are determined to exist by the Health Department. This will provide the nursing home administrator an opportunity to request a review of the factors which affect the status of his facilities."

The communication discusses, at length, deficiencies and the possibility of waivers as to them, and the function of an "advisory group" and its composition but also makes it clear that any decision of the board is merely advisory. It states:

"* * * The Director of Public Welfare will take into consideration the recommendation of the Board, and subsequently make a final decision regarding the appeal. The nursing home administrator will be promptly notified of the Director's decision."

Considerable activity of the department began about

June 14, 1972, by its sending, to SNH operators or administrators, documents titled "Title XIX Agreements." Plaintiffs' exhibit 28 was identified by Ted Fry, assistant director of the division of medical assistance of the department of public welfare, as a provider agreement under Subchapter XIX, Social Security Act.

The purpose of the agreement is set out, as follows:

"For purposes of establishing eligibility for payment under Title XIX of the Social Security Act; of insuring that accountable payments are made to the provider, insofar as payments shall not exceed the combined payment received by providers (for furnishing comparable services under comparable circumstances) from the intermediaries or carriers under Title XVIII and beneficiaries under Title XVIII of the Social Security Act (45 CFR 150.30) * * * ."

Set out in section A of the document are eleven items to which "The Facility Agrees," the last of which reads:

"* * * that any breach or violation of any one of the above provisions shall make this entire agreement, at the Department's option, subject to immediate cancellation."

"The Department Agrees," in section B, to do four specific things, number four of which is as follows:

"To grant facilities the right to a state hearing concerning disagreements with the Department if requested within fifteen days after notification of the Department action against the facility. The right to this due process hearing does not require that the Ohio Department of Public Welfare continue payments to the facility during the pendency of the request for a state hearing. Among the rights provided, the facility has the right to be represented and the right to have a state hearing if the facility requests the same within fifteen days after notification of the Department's action against the home."

That such agreement is for a limited term of months is inferrable from the incompleted form, which states: "the terms of this agreement shall be for a period of——— months, terminating———." The document also provides for reapplication for the purpose of continuing in the pro-

gram, the facility being required to reapply within sixty days before the expiration date of its present agreement.

Any attempt to narrow or simplify this discussion gets lost in the maze of the seemingly applicable statutory enactments and regulations, both state and federal, not to mention the voluminous briefs of counsel, as well as the transcript and record. Three rather clear cut facets of ᵗhe problem presented appear to center around recipients of medicaid benefits, and skilled nursing homes—of which there are two distinct groups. One group is composed of homes which failed to be recertified upon the expiration of their agreements with the state, or otherwise refused certification—for example, Midtown, Cleveland. The other group is composed of homes which were summarily decertified: For example Restview, Cincinnati.

Whatever authority the Ohio department of welfare may exercise must find its base in a statutory enactment. The position taken by the department, that it has acted in the present SNH situations on the basis of its contractual agreements with the homes, is no exception to the requirement of a statutory base.

Attention was directed to R. C. 5101.51, quoted *ante,* in which the General Assembly provided that the department of public welfare should work with federal agencies as the single state agency, required by federal statutes and rules to be specifically named, to participate in "a single medical assistance program, as long as federal funds are provided for such assistance." Such enactment appears to be related to 42 U. S. C. Section 301, as enacted and as amended.

That federal statutes and departmental regulations affect the activities of state departments these days, particularly the department of public welfare, in administering the social security program generally, stands as established fact. In the instant case, federal regulations are relied upon and quoted lengthily by our own department. The authority of the Secretary of Health, Education and Welfare to establish and publish rules and regulations in the area of present concern is established by 42 U. S. C. Section 1302, which reads as follows:

"The Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health, Education, and Welfare, respectively, shall make and publish such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of the functions with which each is charged under this chapter."

Defendant director of public welfare relies heavily upon what he claims are controlling regulations. The pertinent ones are supplied in the parties' joint exhibit 9. Its being a joint exhibit suggests its acceptance and approval by both parties. The publication indicates that it is an issue of the U. S. Department of Health, Education and Welfare, and is entitled "DHEW publication No. (SRS) 72-24351." (See also Code of Regulation Volumes 45 "Public Welfare revised as to October 1, 1972, and published by the office of the Federal Register National Archives and Records Services General Services Administration for Verification.")

As provided for in the Social Security Act, section 1396(a):

"A state plan for medical assistance must" provide for many things, detailed in the act, including the requirement to:

"* * * provide for agreements with every person or institution providing services and the state plan under which such person or institution agrees."

And then that which must be provided follows, in great detail.

Federal regulations provide massive details as to standards, treatment, environmental conditions, safety requirements, *ad infinitum*, set out in 45 C. F. R. 249.33 (1972), and in other regulations by reference. The creation of the necessary "agreement" between the state and persons and institutions is conditioned upon meeting requirements in full or with tolerated deficiencies for limited times. In either event, time limits for the continuance of the agreement are contained in the same regulation. The pertinent portions of 45 C. F. R. 249.33(a)(2) (1972) reads as follows:

"(iv) The single State agency agreement with a facility for payments under the plan may not exceed a period of

1 year. Execution of a new agreement shall be contingent upon a determination of compliance with the provisions of subparagraph (I) of this paragraph except that:

"(a) In the case of any skilled nursing homes determined or certified to be in substantial compliance (i. e., is in compliance except for deficiencies) with the requirements of such subparagraph (I) the single State agency may enter into an agreement with such skilled nursing home for the provision of services and making of payments under the plan for a period not to exceed six months * * *."

The section continues and states that the six-month contract is conditioned upon a reasonable prospect that the deficiencies can be corrected in six months and that the existence of them will not jeopardize the health and safety of the patients.

Agreements tolerating deficiencies reach a point of finality according to the further provisions in 45 C. F. R. 249.33(a)(2)(iv)(a) (1972) that:

"(3) no more than two successive agreements for six months are executed with any skilled nursing home having deficiencies, and no second agreement is executed if any of the deficiencies existing are the same as those which occasioned the prior agreement unless the single State agency finds on the basis of documented evidence derived from a survey that the facility has made substantial effort and progress in correcting such deficiencies * * *."

At this point it should be noted that the state of Ohio enjoys the basic right of contract. (49 Ohio Jurisprudence 2d 675, State of Ohio, Section 23.) By the statutory provisions noted, and the federal regulations applicable, the department of public welfare had the authority to enter provider agreements, and if Ohio citizens were to benefit from federal funds supplied to qualified recipients of medicaid, such relationship was required.

The negotiated and concluded agreements concerning which deficiencies had been waived were subject to arbitrary time limits. If the regulatory provisions were applicable and those time limits expired, recertification was not only not possible but specifically prohibited. In those in-

stances no prior evidentiary hearing is required since no new provider agreement can be created under federal regulation.

The other group of skilled nursing homes, which the department of public welfare summarily "decertified," requires attention. The Attorney General discusses the "policy" of the department as to decertification during the term of the provider contract, but at no point does he cite a statute or regulation authorizing summary decertification. An examination of the Code of Federal Regulations and statutes reveals nothing resembling authority for summary decertification. Certainly there is no definite spelled-out authority for such action. Only a slight suggestion of such is contained in 45 C. F. R. 250.23 (1972). It follows a recital of directions for inspections and reviews of facilities and services, and requires reports of such to the proper federal agencies. The section then says that the reports and recommendations must be submitted and such "followed by appropriate action on the part of the single State agency."

Notwithstanding the announced stance of the director that the department has authority to summarily decertify under the provisions of the provider contract, such agreement also indicates a possible "state hearing" as being available to the person or institution a party thereto. In the agreement attention is called to the requirement of notice within fifteen days after notification of the department's action against the facility.

The director likewise departs from the summary approach and suggests the use of a qualified advisory board to function in matters concerning the waiver of requirements. Assurance is given only, however, that the director "will take into consideration" the recommendations of the board. Federal regulations recommend wide use of experts, specialists, and professional people on boards of inspection and inquiry as well as in advisory capacities.

The narrow question as to the summary decertification situations shows through in the comment of counsel for the SNHs. It is as follows:

"The defendants contend that ODPW is specifically

prohibited from entering into a new provider agreement with a nursing home which does not comply with federal standards. 45 C.F.R. 249.33. This contention is not disputed. However, it avoids the issue of how the determination that a home 'does not comply with federal standards' is to be made. There is no practical reason why the skilled nursing home may not and should not be afforded a hearing before there is a refusal to renew the contract.''

Counsel agree that any new certification can come only upon compliance with federal statutes, and further suggest that there is no "practical" reason why a prior hearing could not be afforded before the refusal to renew. Such proposition appears to be in accord with the position taken by this court as noted above.

But what of summary decertification? Is a hearing "practical" in those cases? and if it is, is that all that is necessary to impose the obligation of a prior evidentiary hearing upon the department before issuing a summary order? The reference of the department to a "state hearing" within fifteen days after notice seems to reflect the shadow of R. C. Chapter 119 on the departmental thinking. The trial court flatly found that the defendant, director Canary, was obliged to comply with the hearing and notice requirements of R. C. Chapter 119, to which defendants take exception in assignment of error number six. Since no federal statute or regulation has been cited, or discovered in the course of the research for this discussion, which directs that a prior hearing be held before a summary order is issued, such a direction must be found in a statutory enactment, to be distinguished from a mere practical situation, by the General Assembly of Ohio. There being no specific legislative act to the point, legislative pronouncements must come from the administrative procedure act (R. C. Chapter 119), to which attention is directed.

By way of introduction to a discussion of the applicability of R. C. Chapter 119, several basic allegations contained in the plaintiffs' amended complaint should be noted. A portion of a very basic allegation reads as follows:

"7. Plaintiff corporations provide, or provided prior

to decertification, skilled nursing home services for medically indigent persons under Title XIX of the Social Security Act, as amended (42 U. S. C. 1396), pursuant to skilled nursing home provider agreements entered into with the Ohio Department of Public Welfare.''

Another important paragraph in the amended complaint is as follows:

''20. Plaintiffs say that they have been or will be deprived of their certification as a skilled nursing home under Title XIX of the Social Security Act, as amended (42 U. S. C. 1396), without due process of law as guaranteed by the State and Federal Constitutions. Plaintiffs further assert that certification, classification and approval to perform specific nursing home services based upon meeting and maintaining certain required standards is the exercise of the power of license. Since the defendant, Robert B. Canary, has the power to issue, suspend, revoke or cancel the certification, he must therefore at least comply with the hearing and notice requirements of Chapter 119, Revised Code.''

Further, plaintiffs allege that they are duly licensed to operate in Ohio by the department of health under R. C. Chapter 3721 and that such licenses cannot be revoked without a hearing. Plaintiffs further assert:

''The corporate plaintiffs herein say that the action of the defendant, Robert B. Canary, in refusing to continue to provide payments to the corporate plaintiffs for skilled nursing home services provided to Medicaid recipients who have qualified for payments under Title XIX of the Social Security Act, as amended (42 U. S. C. 1396), has the effect of revoking, in part, the licenses previously granted by the Director of Health, without a hearing, and as such deprives the corporate plaintiffs of procedural due process under the State and Federal Constitutions and their rights under Section 3721.03, Revised Code.''

With this background, some of the essentials in R. C. Chapter 119 need review. R. C. 119.01 defines an ''agency'' as ''* * * any official, board, or commission having authority to promulgate rules or make adjudications in * * * [cer-

tain named bureaus and departments and] the functions of any administrative or executive officer * * *.''

At the time of the decision of this court in *Lehew* v. *Rhodes* (1970), 23 Ohio App. 2d 102, we said that the department of welfare was not an agency named in R. C. 119.-01, and that it had not been made subject to the administrative procedure act by any other law passed by the legislature. There is no change in that status of the department to which attention has been called or of which we are aware, at this date.

If there be support for the conclusion of the trial court as to the applicability of R. C. 119.01 *et seq.*, it must be found in the seemingly all-inclusive provisions of the act. First of the broad provisions to be noted is that which defines an adjudication:

''(D) 'Adjudication' means the determination by the highest or ultimate authority of an agency of the rights, duties, privileges, benefits, or legal relationship of a specified person, but does not include the issuance of a license in response to an application with respect to which no question is raised, nor other acts of a ministerial nature.''

R. C. 119.12 speaks broadly also. This section reads:

''Any party adversely affected by any order of an agency issued pursuant to any other adjudication may appeal to the court of common pleas of Franklin County * * *.''

Complainants herein did not appeal from an adjudication in this case but sought a declaratory finding by the trial court to the effect that the defendant, Canary, was required to provide a prior evidentiary hearing and to order such and, further, plaintiffs sought restraining orders and mandatory injunctions in an effort to preserve their existing status. Boiled down, plaintiffs seek primarily to prevent a breach of provider agreements by the state of Ohio with which they seem to be confronted.

A rather supplemental approach by the complainants claims an exercise of the power to license by the department of welfare and that the summary order has the effect of ''revoking in part'' the licenses issued to the plaintiff by the department of health. Such is a rather devious device

to require the procedures prescribed in R. C. 119.01 *et seq.*, to be invoked. Admittedly, the power to license nursing homes is allotted by legislative enactment to the department of health, R. C. Chapter 3721. Further, it is admitted by the plaintiffs, according to allegations in their complaint, that they have not been deprived of a basic nursing home license and, in fact, continue to operate as an intermediate nursing home.

The federal regulations in effect create a special class of nursing home called a "skilled nursing home," which is specifically defined by 45 C. F. R. 249.10 (b)(4)(i) (1972). To qualify as a "skilled nursing home" the facility must *inter alia* be licensed as a nursing home by the state (45 C. F. R. 249.10(b)(4)(i)(a) (1972) and in addition must be "determined by the single state agency to meet all the standards established under Section 1902(a)(28) of the act, as evidenced by an agreement between the single state agency and the facility for the provision of skilled nursing home care and the making of payments under the plan."

The many rules and regulations of concern, the difficult procedural questions presented, the variety of interests and concerns of people and institutions, the influence of government in the matter at hand, to say nothing of mountains of "law" make conclusions in this review difficult.

As a beginning step in resolving this matter, it is important to note the stipulation of the parties, approved by counsel for the parties, filed October 4, 1972, in which it is agreed that:

"1. The right of individual Medicaid recipients to an evidentiary due process hearing prior to a suspension, reduction or termination of payments on their behalf to nursing homes under Title XIX of the Social Security Act, as amended, was established by *Goldberg* v. *Kelley,* 397 U. S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970) and 45 C.F.R. § 205.10 (1971)."

The following is further stipulated and agreed in cases of the decertification of a SNH, or in instances concerning the refusal to renew a provider agreement:

"* * * any payment made to such nursing home on

behalf of an individual Medicaid recipient or recipients residing in such nursing home and certified or classified or found by the State of Ohio to be in need of skilled nursing care shall not be suspended, terminated or reduced until after said individual Medicaid recipient or recipients if residing in such nursing home have been afforded a prior evidentiary due process hearing.''

The trial court in its conclusion of law number one, in effect, recognizes and approves the noted stipulation relying upon the decision of the United States Supreme Court in *Goldberg* v. *Kelley* (1970), 397 U. S. 254, in support of its conclusion as to the necessity of a hearing. Evidence revealed in the transcript is somewhat controversial as to whether the patients did in fact suffer a loss of benefits. There is testimony to the effect that some recipients were back in, or still in, the decertified home and were receiving the same quality of service, while on the other hand there is also testimony that patients were not back in the same home and did, in fact, suffer a loss of benefits. The object of the stipulated hearing is to resolve such conflict of evidence. To agree that an evidentiary hearing is required presumes there will be such even though the trial court merely found the recipients "entitled" to one "as a matter of constitutional due process" but did not order the director of public welfare to proceed with a hearing.

Defendants do not assign as error the conclusion of law number one of the trial court, indicating respect for the stipulation into which they entered.

The trial court concluded that "the suspension, reduction or termination" of the payments to SNHs had the "effect of indirectly suspending, reducing or terminating payments, to recipients of Medicaid." Such conclusion is closely associated with the requirement of a hearing as to the fact of reduction or termination having reached to the recipient so as to affect his continuing status of need for special nursing service and as to whether, in fact, the level of care has been lowered. It is so inextricably involved in the projected evidentiary hearing as to require a postpone-

ment of this court's decision regarding the claimed effect until such time as the evidentiary hearing may resolve the matter.

In its conclusion of law number three, the trial court held that a reduction or termination of the payments noted "has the effect of revoking, in part," the licenses rented to the SNHs by the director of health and such was a denial of due process. As pointed out above, the authority to license nursing homes is conferred upon the Ohio director of health by R. C. Chapter 3721. Under this chapter a nursing home either has a license or it does not. There is no such beast as a partial license. Nothing in the record or transcript indicates the revocation of an existing state license. On the contrary, it appears that the affected homes continued to offer intermediate care to some of the same persons having previously received skilled care. This a nursing home can do only if it is operating under an existing and effective license issued by the department of health.

In considering the trial court's conclusion of law number four, attacked by assignment of error number three, it must be noted that the "stipulation," heretofore mentioned because of its extensive import on the court's conclusions and the errors assigned, contains an agreement that "any payment made to such nursing home on behalf of any individual Medicaid recipient or recipients residing in such nursing home and certified or classified or found by the state of Ohio to be in need of skilled nursing care shall not be suspended, terminated or reduced until after said individual Medicaid recipient or recipients if residing in such nursing home have been afforded a prior evidentiary due process hearing."

It having been stipulated and agreed not to suspend payments in decertification situations it was proper for the trial court to restrain the defendants from further decertification and suspension of payments.

Defendants address assignments of error number four and five specifically to the right of the state of Ohio not to renew a provider agreement with a given SNH. In its conclusions of law five and six, the trial court held that a

prior evidentiary hearing was a condition precedent to a refusal to renew a provider agreement and that such a hearing, by the defendant Canary, must "at least" comply with the hearing and notice requirements of R. C. Chapter 119.

As pointed out in this discussion, the involved provider agreements have fixed termination dates. Social Security regulations under subchapter XIX of the Social Security Act (the act upon which plaintiffs bottom their action) specifically establish those time limits. Any contract, which specifically provides a term to run, with a fixed termination date, voluntarily entered into by the parties, cannot be said to create a property right in any party thereto that will result in its renewal or extension, and such a refusal does not constitute a denial of due process of law. Such rule would be applicable here if indeed the "provider agreement" is simply and only a contract.

If indeed a decertified SNH is entitled to a Chapter 119 due process hearing, a home suffering from the failure of the department to recertify it, by its failure to review a contract, is not entitled to such.

The trial court's conclusion of law number eight brings into consideration the applicability of R. C. Chapter 119 to these matters. Plaintiffs here seek rights under subchapters XVIII and XIX of the Social Security Act. Only incidentally is Ohio law, or regulations of the department of public welfare involved. The cause of action turns largely upon the effect of the acts and orders of the welfare department on Medicaid recipients, the direct subject of the Social Security legislation involved.

Complainants herein made no attempt to "appeal" from any ruling of the department of public welfare, as though there might have been an adjudication, but moved directly, and appropriately, to forestall by way of a mandatory injunction the anticipated breach of an existing contract the SNHs had with the state. Plaintiffs would seem to accept the fact that no adjudication was undertaken by the department, but rather a routine decertification was made

which was in a sense, perhaps, to be regarded as an act ministerial in nature and one not therefore subject to the administrative procedure act.

In any event, the relief sought in the instant action is primarily equitable. This fact focuses attention upon the trial court's conclusions of law numbered nine, ten and eleven, challenged by defendants' assignment of error number eight. The language employed in those conclusions of law might seem to be all-inclusive, directed to relief for both decertified SNHs and those a party to a provider contract which has expired. The two groups may not be dealt with in precisely the same fashion. As pointed out, even the plaintiffs agree that the renewal of a provider agreement, or recertification, cannot be accomplished unless there is a compliance with federal statutes and regulations. The necessary holding, therefore, according to conclusions in this decision, *ante*, is that the lapsed provider agreements terminated by the included provisions do not require a hearing, there being no property interest involved demanding such an exercise of "due process."

Having been unable to find any statutory provision, or regulation authorizing summary decertification, it follows that the trial court properly enjoined decertification and the termination of payments made, without a hearing, and in contemplation of the stipulated hearing the order should be continued until at least after that hearing. (Conclusion of law number nine.)

The mandatory injunction requiring that the classification of the SNH and Medicaid patients assigned thereto as it was at the time the litigation with which we are here concerned was filed is appropriate as to decertified homes for the reasons herein set out. (Conclusion of law number ten.)

Recertification as required by the mandatory injunction set out in the trial court's conclusion of law number eleven must be limited to decertified homes and not regarded as extending to a home having lost its standing as a provider by reason of a failure to remove deficiencies within the time limits prescribed in the agreement.

The equitable relief granted by the trial court must

be understood to apply only in case of a decertified home.

45 C.F.R. 249.10(B)(4)(i) tends to indicate that the "agreement" to some extent partakes the nature of a license to operate as a "skilled nursing home" under the federal act and regulations. However, assuming that the "agreement" is actually a federal license, R. C. Chapter 119 does not apply because the "license" is not a state license but a federal license with the state agency acting as an agent of the federal government in issuing the "license." The right to a hearing, as well as the conditions upon which the "license" will be issued, is necessarily controlled, not by state law, but by the federal law and regulations.

Defendants have offered one other assignment of error, number seven, which is directed to the trial court's conclusion of law number eight, which found the hearing afforded Avon Oaks Nursing Home not to have been in accordance with the requirements of Chapter 119. Avon was a decertified home. The hearing afforded could well have been adequate, even though not precisely within R. C. Chapter 119 standards, which the trial court said was required, and sufficient to satisfy a "due process" concept. Avon, like the others which were decertified, is entitled to the coverage provided by the mandatory injunction ordered by the trial court.

### Summary Conclusion

Until such time as the hearing, required by virtue of the stipulation of the parties, is consummated and a decision reached, the holding of the trial court that a suspension of payments to the decertified homes indirectly reduced or terminated payments to Medicaid recipients is inappropriate. Assignment of error number one is sustained.

The finding of the trial court that the acts of decertification amounted to a partial revoking of a nursing home state license is in error. Assignment of error number two is sustained.

Having held that a mandatory injunction was appropriate, equitable relief to be afforded homes in the presence

of a possible breach of existing provider agreements, during term, and that the question of the propriety of the action of the department of welfare may be resolved by the stipulated hearing, temporarily makes the court's conclusion of law number four without effect. Assignment of error number three should be and, at this time, therefore, is overruled.

The trial court's finding that a hearing is a condition precedent to a refusal to renew a provider agreement is in error. Assignment of error number four is sustained.

A "due process' hearing respecting federal law and regulation is not necessarily a requirement that makes R. C. Chapter 119 operative in this instance, especially where the action taken by the plaintiffs was equitable in nature, making the remedy of injunction appropriate; therefore, conclusion of law number six is not well taken. Assignments of error five and six are well taken and are sustained.

The mandatory injunction issued by the Common Pleas Court is sufficient to cover the situation of Avon Oaks. Assignment of error number seven is overruled as to the hearing being null and void.

Conclusions of law number nine, ten and eleven are in error insofar as they apply to other than decertified homes. Decertified homes must be treated according to the directions in the trial court's mandatory injunction. Assignment of error number eight is overruled as to the objection to the court's holding and order respecting decertified homes and is sustained as to those homes which failed to meet recertification requirements and the applicable operative agreement had expired according to the terms thereof.

It is, therefore, ordered that this cause be remanded to the trial court with a direction to modify its mandatory orders in accordance with this decision, and to cause the department of public welfare to order a due process hearing in response to the stipulation entered into by the parties hereto with respect to the interest of the Medicaid recipients as affected by any departmental orders, and for further proceedings according to law and consistent with this decision.

The judgment of the trial court is affirmed in part and reversed in part as indicated. This cause is remanded for further proceedings according to law and consistent with this decision.

*Judgment affirmed in part and reversed in part.*

STRAUSBAUGH and WHITESIDE, JJ., concur.