[L.A. No. 30413. In Bank. Nov. 12, 1975.]

PARAMOUNT CONVALESCENT CENTER, INC.,
Plaintiff and Respondent, v.
DEPARTMENT OF HEALTH CARE SERVICES et al.,
Defendants and Appellants;
DEPARTMENT OF FINANCE,
Real Party in Interest and Appellant.

490

COUNSEL

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, Edward M. Belasco and James E. Ryan, Deputy Attorneys General, for Defendants and Appellants and for Real Party in Interest and Appellant.

David N. Rakov for Plaintiff and Respondent.

Trope & Trope, Eugene L. Trope, Stephen S. Monroe, Weissburg & Aronson, Robert J. Gerst and Lyle R. Mink as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**MOSK, J.**—The sole issue in this proceeding is whether due process compels the Department of Health Care Services[1] to grant a hearing to a nursing home prior to a determination by the department not to renew a contract with the facility for the care of patients entitled to Medi-Cal benefits.

Paramount Convalescent Center, Inc. (hereinafter Paramount) is a nursing home licensed by the state (Health & Saf. Code, § 1250 et seq.) and, from 1968 until December 1972, it provided health care services to recipients of Medi-Cal benefits (Welf. & Inst. Code, § 14000 et seq.) under annual contracts with the department. Most of the funds paid to Paramount under this program are received by the state from the federal government, and as a condition of participating in the program, the department must assure that a nursing home complies with federal standards.

Each contract provided that Paramount would render skilled nursing services to Medi-Cal patients in accordance with Medi-Cal regulations (Cal. Admin. Code, tit. 22, § 51215), and that if Paramount failed to

---

[1]The State Department of Health is the successor to both the former Department of Health Care Services and the former Department of Public Health, respondents below. The term "department" as used hereinafter refers to either the named respondents or the successor agency. The Department of Finance, which made payments under the contracts, is the real party in interest.

comply with these regulations in any respect it would correct the deficiencies. The department, in turn, agreed to certify Paramount as a participant in the Medi-Cal program. These provider contracts are limited by both state and federal regulations to one year (Cal. Admin. Code, tit. 22, § 51215, subd. (a)(12); 45 C.F.R. § 249.33, subd. (a)(6)), although federal regulations provide that a two-month extension may be granted under certain circumstances.[2]

In July 1972, shortly before expiration of a contract with Paramount, the department inspected Paramount's facilities and notified it that the institution failed to meet Medi-Cal standards for nursing homes in 20 specific respects, including the failure to keep adequate patient charts or to follow physicians' orders, and deficiencies in the physical facilities such as hazardous electrical wiring and extremely hot water in the plumbing fixtures used by the patients. A subsequent inspection in September revealed 41 alleged deficiencies. Paramount was notified on November 15 that Medi-Cal payments would be terminated because of its failure to comply with the specified regulations. On November 21, Paramount advised that it was in full compliance with the regulations and demanded a hearing prior to the department's refusal to execute another contract. An inspection on November 22 resulted in 20 reported deficiencies.[3] After both the September and November inspections, Paramount submitted a plan of correction.

The department refused to make further payments to Paramount or to execute another contract,[4] and Paramount sought a writ of mandate to compel renewal. It was alleged that Paramount was in actual or substantial compliance with Medi-Cal requirements, and that the department must afford Paramount an opportunity at a hearing to so demonstrate before terminating payments. Paramount also asserted that 41 of the 46 patients at its facility were beneficiaries under the Medi-Cal program, and that it would be forced to quit business if no new contract was forthcoming.

[2]Under federal law, a two-month extension is appropriate if it appears that "the health and safety of the patients will not be jeopardized thereby, and that such extension is necessary to prevent irreparable harm to such facility or hardship to the individuals being furnished items or services or that it is impracticable within such provider agreement period to determine whether such facility is complying with the provisions and requirements under the program." (45 C.F.R. § 249.33(a)(6).)

[3]Many of the alleged defects violated licensing regulations as well.

[4]The department entered into conditional, short-term contracts with Paramount up to December 21, 1972.

The trial court issued an alternative writ. Ultimately, without deciding whether or not Paramount's allegation of compliance was meritorious, the court determined that Paramount was entitled to a hearing on whether it met the standards prescribed by law, and a peremptory writ was issued ordering the department to grant such a hearing. The court found that Paramount had a significant interest in not being disqualified from participation in the Medi-Cal program, and that due process required that it be afforded a hearing on that issue prior to being deprived of the interest.[5]

██ We initially inquire whether Paramount had a property right in the renewal of its contract, or a mere expectancy or unilateral hope of renewal. In *Board of Regents* v. *Roth* (1972) 408 U.S. 564, 577 [33 L.Ed.2d 548, 561, 92 S.Ct. 2701] it was said: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims."

In *Roth,* as in the present case, the basis of the property right was a one-year contract. The respondent, a nontenured professor hired for one academic year, was informed that he would not be rehired the next year. The court held that he was not entitled to a hearing as to the reasons for the university's failure to reemploy him because he had no possible claim to entitlement to reemployment. There was no statute or university rule or policy which secured such an interest or created any legitimate claim to it; thus the respondent had only an abstract claim in being rehired but no property interest sufficient to require a hearing.

By contrast, in the companion case of *Perry* v. *Sindermann* (1972) 408 U.S. 593 [33 L.Ed.2d 570, 92 S.Ct. 2964], the court held that a teacher who had been rehired under one-year contracts for ten successive years

---

[5]The trial court explained the reasons for its decision as follows: Although Paramount may not have a property right in renewal of the contract, its interests were substantially affected by the department's failure to renew the agreement, since its business depended upon such renewal. A hearing might not be required if the failure to renew was due to a reason not personal to Paramount, such as lack of funds or a surplus of nursing homes, but since the contract was not renewed because of Paramount's alleged failure to comply with the regulations, a hearing is required.

by a state college system must be afforded the opportunity to demonstrate that he had a property interest in reemployment and thus a right to a hearing as to the reasons for the refusal to rehire him. The court reasoned that, despite the fact that he had only a one-year employment contract, the college rules, regulations, and understandings might justify a legitimate claim to entitlement to continued employment, absent sufficient cause. (Also see *Balen* v. *Peralta Junior College Dist.* (1974) 11 Cal.3d 821, 830-831 [114 Cal.Rptr. 589, 523 P.2d 629].)

Likewise, *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011], held that since welfare benefits were a matter of statutory entitlement, due process requires a hearing as a condition of termination, and that since the welfare recipient is destitute without such aid, the hearing must be afforded prior to the time the benefits are withdrawn.

Our decision as to whether Paramount was entitled to a hearing prior to the department's refusal to renew its contract must, under the rationale of these cases, turn upon whether the statutes, regulations and policies applicable to nursing home provider contracts demonstrate that Paramount had a legitimate claim of entitlement to a new contract, i.e., a property right of which Paramount could not be deprived without a hearing, or whether it had a mere expectancy or hope that future contracts would be forthcoming.

We turn, then, to the regulations under which the Medi-Cal program functions. Title 19 of the Social Security Act (42 U.S.C. § 1396 et seq.) provides for a medical assistance program financed largely by federal funds but administered by the states. The federal government makes payments to the states for the purpose of maintaining patients under the program in nursing homes. As we have seen, federal law limits provider contracts to one year, with a two-month extension under certain circumstances. (See fn. 2, *ante.*) Prior to executing a contract with a nursing home, the state must assure that the home is licensed, must certify that it meets the standards set forth in the federal regulations (45 C.F.R. § 249.33(a)(1)(i)), and inspect the facility at least once a year to assure compliance with the regulations. (45 C.F.R. § 250.23(a)(3)(iii).)

California has implemented the federal requirements in the Medi-Cal Act (Welf. & Inst. Code, § 14000 et seq.) and the regulations promulgated thereunder in title 22 of the California Administrative Code. Under these regulations, a nursing home is entitled to participate in the

Medi-Cal program if it meets the standards set forth in section 51215 of that title. (Cal. Admin. Code, tit. 22, § 51451.) Section 51215 provides that participation is conditioned upon licensing by the state and compliance with federal and state regulations. In the event of such compliance, the nursing home "shall" enter into a contract of one year or less with the department, and subsequent agreements are conditioned upon a determination by the department that the facility continues to meet those standards. The manifest intent of both the state and federal regulations is to assure that Medi-Cal recipients be cared for only in nursing homes which meet the standards set forth therein.

The department asserts that these regulations do not afford Paramount a property right beyond the period of the contract, nor a legal expectancy that the contract will be renewed after its expiration date, that the state is in the same bargaining position with respect to a nursing home as it is vis-à-vis a commercial supplier of goods or services, and that the renewal of a provider contract constitutes a new agreement which the state is free to refuse without a hearing. The department also contends that if, as Paramount asserts, a hearing must be afforded before a determination not to renew a provider agreement is effective, the one-year limitation specified by the federal regulations could not be met and therefore millions of dollars in federal grants would be lost to the state.

Paramount urges, on the other hand, that it is entitled to a renewed contract under sections 51215 and 51451 of the California regulations, and may not be deprived of that right without notice and a prior hearing to determine the question of compliance.

In our view, the regulations described above do not justify Paramount's claim of entitlement to a new provider agreement.

We consider, first, Paramount's assertion that because the California regulations provide that any nursing home which complies with the regulations may participate in the Medi-Cal program (§ 51451) and that the department and a nursing home "shall" enter into a contract (§ 51215), every qualified nursing home has a statutory entitlement to a contract and thus to a hearing prior to nonrenewal. We reject this concept.

At first blush these mandatory provisions lend encouragement to Paramount. But the purpose of the provisions is not to bestow a benefit

upon the nursing homes which provide services to Medi-Cal recipients; it is to protect the patients. Both federal and state law emphasize that the basic premise of government-supported health programs including the Medi-Cal program, is to afford recipients the widest possible choice of qualified care facilities. (42 U.S.C. § 1395a; Welf. & Inst. Code, § 14000, subd. (b); *California Medical Assn.* v. *Brian* (1973) 30 Cal.App.3d 637, 642 [106 Cal.Rptr. 555].) Thus, the provisions in question assure that the department will not refuse to pay for a Medi-Cal beneficiary's care in a nursing home of his own choosing for reasons unrelated to his welfare, such as the administrative convenience of the department.

In this respect, the posture of Paramount is different from that of the welfare recipient in *Goldberg* v. *Kelly, supra,* 397 U.S. 254, or the teacher in *Perry* v. *Sindermann, supra,* 408 U.S. 593. In those cases the chief beneficiary of the entitlement was the person who claimed he had the right to a hearing before being deprived of certain benefits, whereas, here the "entitlement" is not intended to benefit the party which demands the hearing. Since Paramount is not the primary beneficiary of the "entitlement" in section 51215, the rationale of the cases cited above does not compel a holding that it has a right to a prior hearing.

Another significant factor in assessing Paramount's argument is that section 51215 would be rendered internally inconsistent if we were to hold that a nursing home is entitled to a hearing prior to the department's refusal to renew a provider contract. For it would be impossible in many cases to honor the requirement of the section that a contract be limited to one year and that no new contract may be executed unless a nursing home complies with the regulations while at the same time requiring a hearing prior to the refusal to renew.

Obviously, a nursing home's facilities must be inspected near the date of contract termination in order to determine compliance. It is apparently the practice of the department to inspect a facility within 90 days of the expiration of a contract, to notify it of any deficiencies, and to obtain a plan of correction from the nursing home. After the lapse of some period to allow the nursing home an opportunity to correct the deficiencies, another inspection is held to determine whether corrective action has been completed. In view of this time-consuming process, the department will ordinarily be unable to comply with the one-year limitation if it must afford a hearing prior to the expiration of the contract, or even of the two-month extension permitted by federal law.

In the present case, for example, three inspections were conducted over a four-month period, one of them revealing forty-one alleged deficiencies. A full-fledged airing and meaningful determination of such a multitude of charges could not be concluded within the time limitations set forth in the regulations.

■ The obvious purpose of the requirement that a contract with a nursing home be limited to one year is to assure that the facility meets state and federal requirements as a condition of continued participation in the Medi-Cal program. The cancellation of a contract during its term requires notice and hearing in accordance with section 11500 et seq. of the Government Code (Welf. & Inst. Code, § 14123), and the one-year limitation was designed to avoid the necessity of deferring the withdrawal of Medi-Cal funds from a facility which is in patent violation of the regulations until a full hearing can be held regarding the charges of noncompliance. Unquestionably, the limitation of contracts to one year provides a powerful incentive to a nursing home to assure that it continues to render adequate care to Medi-Cal recipients, in accordance with state and federal requirements.

Nor are we aware of any understandings between the department and Paramount that a provider agreement will be renewed as a matter of course. Amicus curiae, the California Association of Health Facilities, asserts that from 1968 until Paramount was refused a contract in 1972, the department automatically renewed provider agreements upon expiration, and that the present case represented the first instance of a refusal by the department to renew. However, the requirement that a new provider agreement be conditioned upon a determination of compliance with the regulations first appeared in section 51215 of the California regulations in 1972, the same year in which, according to amicus, the practice of automatic renewal ended.

Thus, the present case is distinguishable from *Perry* v. *Sindermann, supra,* 408 U.S. 593. Although *Perry* also involved a claim of entitlement based upon a one-year contract, there the regulations as well as the practices of the college indicated that the teachers enjoyed de facto tenure and there was an express representation that they would not be discharged without cause, demonstrated at a fair hearing consistent with the requirements of due process. In the present case, by contrast, the applicable regulations informed Paramount that the renewal of its contract depended upon a determination that it comply with certain

regulations, and not only was there an absence of a promise of a due process hearing prior to nonrenewal, but pragmatically such a hearing could not occur before expiration of the contract term.

■ We conclude that Paramount's interest in the renewal of the provider contract amounted only to a hope or a unilateral expectation of renewal rather than to a legal entitlement. ■ But we do not intend to imply by this holding that the department may arbitrarily refuse to enter into a contract with a nursing home which meets the requirements of federal and state law. Rather, the effect of the provisions described above is to place upon a facility, as a condition of the renewal of its contract, the burden of demonstrating annually that it complies with the appropriate standards. If the department determines not to renew a contract because of an alleged failure to conform to those requirements a nursing home may challenge the propriety of the refusal by the very means which Paramount employed in the present proceeding, i.e., by seeking a writ of mandate alleging compliance with the regulations, and an order to compel the department to enter into a contract. We do not perceive any constitutional impediment to imposing such a requirement upon a profit-making institution which desires to participate in a government-funded program.

■ But, argues Paramount, even if we should conclude that it is not legally entitled to a renewed contract, a hearing prior to nonrenewal must nevertheless be afforded to it on the independent ground that the failure to renew because of alleged noncompliance with the regulations amounts to a charge of incompetence, dishonesty, or immorality. In *Board of Regents* v. *Roth, supra,* 408 U.S. 564, the court stated that if the failure to rehire Roth had been accompanied by charges seriously damaging his standing in the community or his ability to obtain another job, he would be entitled to a hearing to refute the charges and clear his name. (See also *Zumwalt* v. *Trustees of Cal. State Colleges* (1973) 33 Cal.App.3d 665, 678-679 [109 Cal.Rptr. 344].)

Without being insensitive to the realities of the commercial world, we cannot agree that a determination by the department that a nursing facility has failed to meet its burden of showing that it complies with government regulations is the equivalent of a charge of incompetence or immorality. Even if that were true, however, there is a clear distinction between the circumstances of *Roth* and *Zumwalt* and the present case. A major reason why a teacher charged with misconduct or incompetence is

entitled to a hearing to enable him to refute the charges against him is to avoid the possibility of damaging his prospects of employment at other schools. In the instant situation, the thrust of the hearing sought by a nursing home is not to enable the facility to clear its name so that it may attract patients outside the Medi-Cal program, but to participate in the program itself.[6] Thus, to a considerable degree, the rationale underlying the requirement for a hearing expressed in *Roth* is not germane where, as here, a nursing home seeks not moral vindication but renewal of a financially lucrative contract.

Paramount relies upon *Ross* v. *State of Wisconsin Dept. of Health & Social Serv.* (E.D.Wis. 1973) 369 F.Supp. 570 and *Coral Gables Convalescent Home, Inc.* v. *Richardson* (S.D.Fla. 1972) 340 F.Supp. 646, in support of its claim to a prior hearing. (But see *Shady Acres Nursing Home, Inc.* v. *Canary* (1973) 39 Ohio App.2d 47 [68 Ohio Ops.2d 210, 316 N.E.2d 481].)

In *Ross,* the court invalidated a Wisconsin statute providing for immediate removal from a nursing home of patients receiving public assistance, if the state determined that the facility did not comply with state standards and the health and safety of the patients was endangered. It was held that the nursing home had a property interest in retaining these patients since its claim of entitlement was defined by statute, and that the patients could not be removed without notice and hearing except in a true emergency. *Coral Gables* held that a nursing home was entitled to a hearing to determine whether the government had acted properly in withholding Medicare funds because of alleged previous overpayments. Neither of these cases involved the failure to renew a provider contract upon its expiration, and their reasoning is therefore not persuasive in the present context.

We recognize that the refusal of the department to renew a provider agreement may seriously affect a nursing home's business. Nevertheless, this factor alone cannot be deemed decisive. For any vendor of goods or services to the state may be equally damaged if it has become dependent upon government purchases for a substantial portion of its income and the state chooses not to renew a purchasing contract. Yet no one would suggest that the vendor's dependence upon government purchases alone

---

[6]Paramount frankly admits that it is unable to function with private patients alone. According to amicus curiae, the California Association of Health Facilities, the overwhelming majority of nursing homes are in the same position.

results in a legal entitlement to a new contract or that the vendor is entitled to a due process hearing as a condition of nonrenewal.

The Medi-Cal program was created for the benefit of those eligible to receive assistance under it, and not for the economic advantage of nursing homes which render services to the beneficiaries. This basic premise imposes upon us the duty to interpret the rules applicable to the program in a manner favorable to the beneficiaries unless constitutional prohibitions dictate otherwise. Our determination that a nursing home is obliged to demonstrate annually that it meets the standards for participation in the program and that it is not entitled to a hearing prior to nonrenewal of a provider contract is consistent both with due process of law and the promotion of the welfare of Medi-Cal patients, a vulnerable and exploited class of persons who are frequently powerless to vindicate their own rights.

The judgment is reversed.

Wright, C. J., McComb, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

**TOBRINER, J.**—I dissent. The majority, in concluding that the State Department of Health need not afford a hearing to Paramount before declining to renew its Medi-Cal provider contract, embraces an unjustifiably restrictive conception of that property which the due process clause protects. The majority's opinion begins, as it should, with a reference to *Board of Regents* v. *Roth* (1972) 408 U.S. 564 [33 L.Ed.2d 548, 92 S.Ct. 2701]. *Roth* distinguished unilateral expectations, which fall without the ambit of the due process clause, from legitimate claims of entitlement, which command due process protection. Because I see no alternative to the conclusion that Paramount stands statutorily entitled to the renewal of its contract with the department so long as certain conditions are satisfied, I must dissent from the court's opinion.

The due process clause has long constituted a bulwark against arbitrary government infringement upon private property rights. In recent years, the realization that the common law concept of property proved ill-suited to an economy characterized by massive government intervention through contract and subsidy called for an expansion of the species of property protected by the due process clause. (See Reich, *Individual Rights and Social Welfare: The Emerging Legal Issues* (1965)

74 Yale L.J. 1245.) The United States Supreme Court lent judicial imprimatur to this expanded notion of property in *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011], when it required New York to provide welfare recipients a hearing prior to the termination of their welfare benefits.

*Perry* v. *Sindermann* (1972) 408 U.S. 593 [33 L.Ed.2d 570, 92 S.Ct. 2964], a companion case of *Roth,* later indicated that property interests short of formal contractual agreements or explicit statutory guarantees could implicate the due process clause. In *Perry,* the court required a college to provide a hearing to a nontenured teacher before refusing to renew his one-year contract. The practices and regulations of the college, the court concluded, secured a legitimate claim of entitlement to continued employment, the absence of a contractual guarantee notwithstanding.

Paramount stands entitled to a hearing as certainly as the welfare recipients in *Goldberg* and more so than the teacher in *Perry*. Like the plaintiffs in *Goldberg,* Paramount roots its claim of entitlement in explicit statutory language. The regulations governing Medi-Cal speak in mandatory terms: any nursing home that complies with the regulations may participate in the program (Cal. Admin. Code, tit. 22, § 51451) and the department "shall" enter into a contract with every qualified nursing home. (§ 51215.) These mandatory provisions confer upon Paramount a statutory right to participate in the program, subject only to its compliance with the apposite regulations. The clear import of *Goldberg,* then, is that the department cannot exclude it from the program without offering it an opportunity to demonstrate its compliance with those regulations.

The majority concedes that "[a]t first blush these mandatory provisions lend encouragement to Paramount." (Majority opn., *ante,* at p. 496.) For two reasons, however, it concludes that these regulations confer no property right upon Paramount. Paramount's position does not pale so rapidly in the face of these arguments as the majority would have it.

The majority submits first that Paramount, unlike the plaintiffs in *Perry* and *Goldberg,* is not the intended beneficiary of the statutory entitlement. Medi-Cal, the argument goes, is intended to protect the patients, not enrich the nursing homes. Consequently, the program bestows no claim of entitlement upon any nursing home. Although the

factual premise of the argument is no doubt correct, it hardly casts Paramount's interest in the renewal of its contract beyond the purview of the due process clause. Three conceptual hurdles stand between that premise and the conclusion the majority culls from it.

First, the majority should have crafted its inquiry into statutory intent more narrowly. The Medi-Cal program surely sprang from a concern about patients, not nursing homes. The possibility remains, however, that the mandatory language in the specific sections that give rise to Paramount's claim of entitlement emanates from a legislative purpose to allocate the incidental benefits to nursing homes in an equitable manner. The majority makes little attempt to divine the purposes that actuated these specific sections, but largely contents itself with a recital of the purposes of Medi-Cal as a whole. While the majority does note that these regulations effectuate the goal of Medi-Cal that patients have as wide a choice of nursing homes as possible, it simply assumes that that was the sole motive behind the mandatory provisions. I am not so prepared summarily to dismiss the possibility that the Legislature intended to curtail caprice in the distribution of government bounty.

Second, the department should afford Paramount a hearing even if the due process clause is concerned exclusively with effecting statutory intent and the statute's sole purpose is to protect nursing home patients. The court acknowledges that Medi-Cal endeavors to enhance the welfare of patients by providing a wide choice of nursing homes. An arbitrary refusal to contract with a qualified home subverts that legislative design. The most straightforward way to protect the freedom of choice of the patients is to recognize the right of the home to establish its compliance with the relevant regulations at a fair hearing.[1]

Third, and most fundamentally, the court's argument misconceives the doctrinal posture of the due process clause. That clause does not serve merely as a judicial vehicle for effecting legislative intent. Its role is more general and more basic: it strives to curtail arbitrary government deprivation of rights in life, liberty, and property.[2] Consequently, the

---

[1] The nursing home clearly has a more compelling interest in promptly and persuasively defending its right to contract renewal than any of its residents. Moreover, only the nursing home can effectively protect the interests of future nursing home residents who might opt for this particular nursing home.

[2] See, e.g., *Fuentes* v. *Shevin* (1972) 407 U.S. 67 [32 L.Ed.2d 556, 92 S.Ct. 1983] (goods bought under conditional sales contracts); *Goldberg* v. *Kelly, supra* (welfare benefits); *Armstrong* v. *Manzo* (1965) 380 U.S. 545 [14 L.Ed.2d 62, 85 S.Ct. 1187] (child custody); *Greene* v. *McElroy* (1959) 360 U.S. 474 [3 L.Ed.2d 1377, 79 S.Ct. 1400] (employment).

sole inquiry becomes whether Paramount possesses a property right in the renewal of its provider contract. This much the majority acknowledges. *Roth* tells us that legitimate claims of entitlement are protected property interests. The inevitable conclusion is that Paramount has a right to a hearing if it is "entitled" to the renewal of its contract. The majority does not deny that Paramount is so entitled; indeed, it confesses that "a nursing home *is entitled* to participate in the Medi-Cal program if it meets the standards set forth in . . . that title." (Majority opn., *ante,* at pp. 495-496, italics added.) Rather, the majority imposes the additional requirement—neither contemplated by the federal cases nor reconcilable with them—that the entitlement arise from a program designed to benefit the party asserting it.

It is not surprising that the majority finds no language in *Goldberg, Roth,* or *Perry* to support its novel proposition.[3] The due process clause protects all property; the fact that the property arose from a government program designed primarily to benefit someone else is, perforce, inconsequential. The only conceivable basis for the majority's opinion would be the untenable theory that some entitlements are not property. *Roth* surely put that hypothesis to rest. (408 U.S. 564, 577 [33 L.Ed.2d 548, 560-561]; see also *Goldberg* v. *Kelly, supra,* 397 U.S. at p. 262, fn. 8 [25 L.Ed.2d at pp. 295-296].) The passage from *Roth* quoted by the majority renders transparent the weakness of such a theory: "It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." (408 U.S. 564, 577 [33 L.Ed.2d 548, 561].) *Roth* bottomed its conclusion that legitimate claims of entitlement merit due process protection squarely on notions of reliance—not of effecting statutory goals. Considerations of fairness and the realities of the marketplace both impel the conclusion that nursing homes rely upon the government's compliance with regulations that have impact upon those homes, even if the regulations are designed to benefit third parties.

I frankly doubt that this court would be willing to follow the majority to the point where the principle it espouses might lead it. For example, it

---

[3] It is not even clear that *Perry* would have come out as it did had the majority's test been applied. In part, the court based the finding of a de facto tenure system on the common practice of rehiring teachers. The rehiring of teachers as a matter of course may have reflected nothing more than administrative convenience; consequently, it is questionable whether the teacher in *Perry* was an intended beneficiary of that practice.

is not at all inconceivable that some welfare programs spring primarily from a concern for the well-being of persons other than the welfare recipients: the potential victims of those whom poverty forces to crime, the children of impoverished parents, and the ordinary citizen who—revulsed by the manifestations of poverty—would rather eradicate it than face it. If welfare programs devolved primarily from such non-egalitarian motives, the court's paradigm would leave helpless an individual whom the government arbitrarily refused to aid. I find it difficult to believe, however, that the court would have the judiciary ignore blatant refusals to aid those who satisfy the eligibility criteria. Since the relevant statute confers them with a legitimate claim of entitlement, they must be accorded a hearing. Paramount deserves no less.

The majority proffers a second reason for denying Paramount's statutory claim of entitlement to due process protection. It insists that requiring a hearing prior to refusing to renew a provider contract would preclude compliance with the statutory requirements that contracts be limited to one year and that no new contract be executed before a nursing home complies with the regulations. This argument is misdirected. Although the pragmatic difficulties that would attend granting Paramount a hearing properly bear upon the form and timing of that hearing, they are of no consequence in the threshold determination whether *some* form of due process hearing is required. (*Board of Regents* v. *Roth* (1972) 408 U.S. 564, 570-571, fns. 7, 8 [33 L.Ed.2d 548, 556-557, 92 S.Ct. 2701].) At most, the majority's argument justifies carefully contouring the required hearing to permit satisfaction of the federal regulations.

Neither of the arguments the majority adduces suffices to cast Paramount's entitlement beyond the pale of due process. Consequently, it stands entitled to some form of hearing in connection with the department's refusal to renew its provider contract. The majority's contrary conclusion conflicts with the pronouncement of a lower federal court. In *Ross* v. *State of Wisconsin Dept. of Health & Social Serv.* (E.D.Wis. 1973) 369 F.Supp. 570, the court invalidated a statute providing for the immediate removal from a nursing home of patients receiving public assistance upon a determination that the home's failure to comply with certain standards endangered the health and safety of the patients. The court reasoned that the nursing home had, by virtue of statutory entitlement, a property interest in retaining these patients of which it could not be divested without notice and hearing absent a true

emergency. Although *Ross* did not deal with the renewal of provider contracts, it nonetheless applies to the present case since it recognizes a property interest of the nursing home in retaining public assistance patients according to the terms of the relevant statute.[4]

While the Fourteenth Amendment posits the right to due process in unequivocal terms, it leaves less clear precisely how much process is due. In most cases, the due process clause guarantees a hearing prior to a final deprivation of property. (*Goss* v. *Lopez* (1975) 419 U.S. 565, 579 [42 L.Ed.2d 725, 737, 95 S.Ct. 729]; *Board of Regents* v. *Roth* (1972) 408 U.S. 564, 570, fn. 7 [33 L.Ed.2d 548, 556, 92 S.Ct. 2701]; *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011].) Sufficiently exigent circumstances, however, can justify the provision of only an after-the-fact hearing. (*Board of Regents* v. *Roth, supra,* 408 U.S. 564, 570, fn. 7; *Boddie* v. *Connecticut* (1971) 401 U.S. 371, 377 [28 L.Ed.2d 113, 118, 91 S.Ct. 780].) It remains to inquire, then, whether the circumstances of this case justify the provision of a hearing only after the refusal to renew the contract.

The majority opines that it would be impossible for the department to inspect nursing home facilities late enough to be assured that the home complied with the germane regulations at the time the new contract was executed and early enough to permit the conduct of a hearing before the old contract expired. The majority, I think, overplays the difficulty of accommodating compliance with the federal regulations and provision of the pretermination hearing. The department currently inspects nursing homes within 90 days of the expiration of the extant provider contract. In the period between the initial inspection and the contract's expiration, the department receives from the home a plan to correct any deficiencies, gives the home time to effect the corrections, and inspects the facility again to ensure the corrections have been completed. I see no reason why the department could not commence this process 100 days, rather than 90 days, before the contract expires or expedite each of the steps in the process by a few days.[5] By either process the department will have ample time prior to the expiration of the old contract to conduct the requisite

---

[4] *Shady Acres Nursing Home, Inc.* v. *Canary* (1973) 39 Ohio App.2d 47 [68 Ohio Ops. 2d 210, 316 N.E.2d 481], cited by the majority at page 500, *ante,* arrives at a contrary conclusion, but does not discuss *Roth, Perry,* or *Goldberg.* Its persuasive value, therefore, is limited.

[5] In the present action the department apparently had time to go through the entire process twice.

hearing.[6] Moreover, the federal regulations permit two-month extensions of the provider contracts where necessary to prevent irreparable harm to facilities. (45 C.F.R. § 249.33(a)(6).) The accommodation of a pre-expiration hearing with the federal regulations should not, therefore, prove intractable.

A more plausible warrant for affording only a post-expiration hearing stems from a concern for a patient residing in a substandard facility. If the purported violations constituted a grave and immediate danger to the welfare of patients, the state might be justified in providing only a post-expiration hearing. The instant matter, however, does not present such a case. In the absence of a true emergency, Paramount should be heard before the expiration of its provider contract. (*Ross* v. *State of Wisconsin Dept. of Health & Social Serv., supra,* 369 F.Supp. 570, 572.) This conclusion draws further support from the singular impact of a refusal to renew the provider contract upon Paramount's operations.[7] (*Goldberg* v. *Kelly, supra,* 397 U.S. 254.)

In sum, I conclude that the mandatory language of the Medi-Cal regulations invests Paramount with a property interest of which it cannot be deprived without due process of law. I find that Paramount deserves a hearing prior to the expiration of its provider contract.

Respondent's petition for a rehearing was denied December 17, 1975. Tobriner, J., was of the opinion that the petition should be granted.

---

[6]Before-the-fact hearings need not feature all the procedural embellishments of their after-the-fact counterparts. *Gagnon* v. *Scarpelli* (1973) 411 U.S. 778, 786 [36 L.Ed.2d 656, 664, 93 S.Ct. 1756]; *Goldberg* v. *Kelly, supra,* 397 U.S. 254, 270 [25 L.Ed.2d 287, 300].) Consequently, they should not consume inordinate time. Nor should the parties require much time to prepare for them. The entire inspection-correction-reinspection process is, in effect, preparation for the hearing.

[7]As Paramount notes, it cannot continue to operate without a provider contract. Consequently, the refusal to renew the provider contract emasculates the value of Paramount's license. Yet the state could not strip Paramount of its license without a prior hearing. It seems questionable to allow the state to effect the same result through the medium of not renewing the provider contract.