Guy **BRACCO et al., Plaintiffs,**

v.

Jerome **LACKNER, M. D., Individually and in his official capacity as Director of the California Department of Health, Defendant and Third-Party Plaintiff,**

v.

QUALITY **CARE CONVALESCENT HOSPITAL CENTERS, INC., a California Corporation, dba the San Franciscan Center, Joseph A. Califano, Secretary, United States Department of Health, Education and Welfare, Third-Party Defendants.**

Civ. A. No. C–78–0471SAW.

United States District Court, N. D. California.

April 5, 1978.

\* \* \* \* \* \*

(2) contracting to supply services or things in this state;"

Public Advocates, Inc. by Sidney M. Wolinsky, Angela Glover Blackwell, San Francisco, Cal., for plaintiffs.

Evelle J. Younger, Atty. Gen., State of Cal., San Francisco, Cal., by Asher Rubin, John Davidson, John Klee, Jr., Deputy Attys. Gen., Ann Miley, California Dept. of Health, San Francisco, Cal., for defendant and third-party plaintiff Jerome Lackner, M.D., et al.

G. William Hunter, U. S. Atty., San Francisco, Cal., by Richard De Saint Phalle, George Christopher Stoll, Asst. U. S. Attys., Cade Morrow, HEW, San Francisco, Cal., for third-party defendant U. S. Dept. of Health, Ed. and Welfare.

Trope & Trope by Eugene L. Trope, Los Angeles, Cal., for third-party defendant Quality Care Convalescent Hospital Centers, Inc.

Van Bourg, Allen, Weinberg & Roger by Stefanie Arthur, San Francisco, Cal., amicus curiae.

Joseph Freitas, Jr., Dist. Atty., by David Moon, San Francisco, Cal., for the Office of the District Attorney, City and County of San Francisco.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RE GRANTING OF MOTION FOR PRELIMINARY INJUNCTION

WEIGEL, District Judge.

These relatively extended Findings and Conclusions, supplementing those in the preamble of the Preliminary Injunction itself, have been prepared by the Court as expeditiously as feasible under the somewhat unusual circumstances of the course of these proceedings from inception to the present.

The plaintiffs are 44 needy, elderly patient-residents of the San Franciscan Convalescent Center ("Center") in San Francisco, California. They seek to represent a class of approximately 150. All but ten plaintiffs and class members are not ambulatory. All need supervised nursing or medical attention and are beneficiaries of "Medicaid" under a federal statutory scheme. Plaintiffs claim that their health and lives are endangered by an imminent cut-off of federal and state benefits forcing their immediate removal from the Center. Officials of the State of California claim the cut-off is required because the private operator has failed to meet established standards for certification.

Shortly after the filing of suit, the Court granted temporary restraining orders (Appendices A and B attached) and an order to show cause why a preliminary injunction should not be issued. At the start of the hearing on the order to show cause, the Court put questions to all counsel relating to the issues. Their answers were unanimous that no resident of the Center should be transferred if it would seriously jeopardize the resident's life and health, that operation of the Center should be continued if the requisite standards could be met and that there is a serious shortage of facilities in San Francisco for care of the needy elderly—care required by state and federal law.

Moreover, all counsel quickly stipulated to a number of matters upon which they were previously in bitter conflict. Their unanimity of goals and their cooperative stipulations augured well for disposition of the lawsuit through settlement, especially when the attorneys enthusiastically agreed to settlement procedures suggested by the Court. The Court participated in the settlement process on the request of all counsel and on their readily given stipulations, made on the record, that the settlement discussions would be and remain wholly off the record in the interest of candid and uninhibited expression by all.

The Honorable Harry W. Low, a judge of the San Francisco Superior Court, before whom was pending a matter relating to the Center, was pleased to join in the settlement efforts. Judge Low, at the outset of his participation, was made privy to the stipulations regarding the privacy of settlement procedures. The stipulations in that regard were renewed by all parties in his presence and he joined this Court in approving them.

Unhappily, the bright prospects for settlement, after extended devotion of time and effort, were dissipated. This required the Court to proceed with consideration of the motion for a preliminary injunction.

The time within which the Court had to rule on that motion was severely limited by two factors. It appeared that, subject only to possible state court intervention, by no means assured, the Center would close for lack of funds at the end of the third day following completion of the hearing on the motion for a preliminary injunction. The second factor requiring prompt action by the Court was related. The defendant State of California officials refused to agree to maintain the status quo for a week following the submission of the motion for a preliminary injunction so as to enable the Court to have a reasonable length of time for consideration of the matter without concern that, as a practical matter, the Court's power for effective action would be destroyed by the closing of the Center and the necessary prior removal of the patient-residents therefrom.

The Court therefore found itself in the position of having to rule upon the motion

for a preliminary injunction almost immediately after submission by the parties. Having anticipated, for several days, the possibility of such "forced" quick action (and having had the benefit of a substantial body of evidence in the form of affidavits submitted by the parties upon which alone, under local court rules, motions for preliminary injunction are normally decided) the Court was in a position to act with the requisite promptness.

It was under these circumstances that the Court was called upon to decide whether or not the plaintiffs were, under the governing standards of the Ninth Circuit, entitled to a preliminary injunction. On the facts and the law now to be set out, the Court resolved that question in the affirmative by granting a preliminary injunction, a copy of which is attached as Appendix C.

## I. Parties.[1]

The named plaintiffs are forty-four patients of the Center. They bring suit on their own behalf and on behalf of a proposed class defined as "all persons who are residing at the San Franciscan Convalescent Center who do now or have, during the course of their residence, been the beneficiaries of any federal or state benefits." The defendant Jerome Lackner, M.D.[2] is sued individually and in his official capacity as Director of the California Department of Health ("Department"). The Department has filed a third party complaint against Quality Care Convalescent Homes, Inc. ("Quality Care") and Joseph A. Califano, Secretary, United States Department of Health, Education and Welfare ("HEW"), third party defendants.

## II. Summary of Allegations of Plaintiffs' First Amended Complaint.

Invoking the jurisdiction of this Court under 28 U.S.C. §§ 1331, 1343(3) and 1343(4), plaintiffs have filed this class action pursuant to Fed.R.Civ.P. 23(a) and (b)(2). They claim that the Department threatens them with unlawful transfer from the Center without notice or opportunity for hearing, and without an adequate relocation plan. They allege that such action may cause injury to their physical and mental health including risk to life. They claim also that some plaintiffs have been improperly reclassified by the Department to receive lower levels of care. Plaintiffs charge that these actions violate Title XIX of the Social Security Act and the regulations promulgated thereunder governing the Medicaid Program, as well as rights based upon the Constitution and state law. They seek injunctive and declaratory relief to prevent their relocation without adequate notice, hearing, and a relocation plan designed to meet their urgent needs.

The Department in its Answer to Plaintiffs' First Amended Complaint denies that it has acted unlawfully in any manner, that a claim for relief is stated under any federal statute or regulation, and that the alleged class would constitute a proper class in this action. The Department seeks a judgment by this Court abstaining from exercising its jurisdiction and denying plaintiffs relief.

## III. State Court Action.

In July of 1977, Quality Care assumed operation of the Center under a six month provisional license issued by the Department. Claiming that frequent inspections

---

1. With the consent of all parties and with the permission of the Court, briefs have been filed and appearances amici curiae have been made on behalf of Joseph Freitas, District Attorney of San Francisco, the San Francisco Lawyers' Committee for Urban Affairs and Carol Ruth Silver (jointly); the federal government; and Van Bourg, Allen, Weinberg & Roger, Counsel for Hospital and Institutional Workers Local 250, the collective bargaining agent for some of the employees of the San Franciscan Convalescent Center (appearance only).

2. The Court notes that Dr. Lackner has resigned his position as Director of the California Department of Health. When a public officer, who is a party to an action in his official capacity resigns his office, his successor is automatically substituted as a party. Although an order of substitution may be entered at any time, the omission to enter such an order shall not affect the substitution. Fed.R.Civ.P. 25(d)(1).

revealed continuing violations of health and safety code regulations, the Department declined to renew that provisional license.

Under authority granted by Calif. Health & Saf. C. § 1291, the Department filed suit in the Superior Court of the State of California in San Francisco, asking injunction against continued unlicensed operation of the Center and authorization for transfer of the Center's patients to other facilities. That action (San Francisco County Superior Court No. 731–253) resulted in an "Interim Order Re Issuance of License", issued by Judge Harry W. Low on January 9, 1978.

The Interim Order required the Department to issue to Quality Care a provisional license and required Quality Care to attempt the sale or transfer of its interest in the Center by April 15, 1978. It further provided, *inter alia,* that Quality Care should hire additional staff and maintain the Center at a level meeting state standards. In the event no licensed transferee could be found, the Court would order implementation of a patient transfer plan. The Department was to prepare, for the approval of the Superior Court, a contingency plan for the careful and orderly transfer of the patients. The Superior Court retained jurisdiction to issue such further orders as necessary for the health and safety of the patients.

Pursuant to the Interim Order, the Department has presented a transfer plan to Judge Low. No plan has been approved to date. However, Judge Low has indicated his intention to hold hearings as to the adequacy of the proposed relocation plan as soon as practical.

## IV. Principal Facts Relating to Issues in This Case.[3]

■ The Center is located at 2130 Post Street in San Francisco. Until mid-February 1978, approximately 300 patients resided there making it the largest convalescent nursing home in Northern California. (Aff. of Sidney M. Wolinsky.) The population of the Center has been reduced from 220 patients as of early March 1978 (Report of Hilda Bannister, exhibit to Aff. of Mary Snyder) to approximately 150 patients at the end of March 1978. (Testimony of Margaret Devoir.) The Center provides both custodial and skilled nursing care requiring active medical treatment. (Testimony of Harold Sugarman, M.D.) Most, if not all, of the Center's patients are beneficiaries of the Medicaid Program which in California is called "Medi-Cal". There is a severe shortage of nursing home beds in San Francisco available to Medi-Cal beneficiaries. (Aff. of Larry Simi.)

The Court has received a substantial amount of evidence regarding the physical and emotional state of the patients at the Center. A number of physicians submitted affidavits or gave oral testimony (or both) regarding specific patients. In addition, the Center's medical records on all the patients were admitted into evidence as Plaintiffs' Exhibit 3. For purposes of illustration, synopses of the medical and emotional problems of several typical patients are given:

---

**3.** The Court has considered the affidavits and exhibits in support of the application for a temporary restraining order; affidavits and exhibits in support of or in opposition to the motion for a preliminary injunction; oral testimony and documentary evidence presented at the hearing on the motion for a preliminary injunction on March 28 and 29, 1978; and the arguments of counsel in open court at the aforesaid hearing and in memoranda and points of authorities submitted in support of or opposition to the applications for a temporary restraining order and for a preliminary injunction. The Court notes that the submission of affidavits in support of or opposition to a preliminary injunction is both customary and appropriate. Such affidavits need not meet the standards of Fed.R.Civ.P. 56(e) or of the Federal Rules of Evidence. The urgency necessitating the prompt determination of the preliminary injunction; the purpose of a preliminary injunction, to preserve the status quo without adjudicating the merits; and the Court's discretion to issue or deny a preliminary injunction are all factors supporting the considerations of affidavits. The weight to be given such evidence is a matter for the Court's discretion, upon consideration of the competence, personal knowledge and credibility of the affiant. See generally, C. Wright and A. Miller, 11 Federal Practice and Procedure § 2949 at 469–473.

| Patient | Problem |
|---------|---------|
| Despina C. | left side paralysis, aphasia approx. 70 years old (Aff. & Testimony of Harold Sugarman, M.D.) |
| Jean L. | approximately 80 years of age blind, disoriented (Aff. & Testimony of Harold Sugarman, M.D.) |
| David W. | 85 years of age congestive heart failure, emphysema, bronchitis, arteriosclerotic heart disease, low ambulatory ability (Aff. & Testimony of Harold Sugarman, M.D.) |
| Ellen S. | 80 years old, broken hip agitated depression parkinsonism (Aff. of Fred Bruni, M.D.) |
| Nancy A. | 87 years old, Parkinson's disease heart condition, chronic bronchitis arthritis, confined to wheelchair (Aff. of Betty Hammer) |
| Harry S. | organic brain syndrome Parkinson's Disease (Pltfs.' Exh. 3) |

No party disputes the fragile condition of the Center's patients. In general they are quite old, many being over 80. They suffer severe, frequently multiple, physical and emotional diagnostic problems. In addition to their physical and emotional problems, many have difficulty with English or are unable to communicate in that language.

In a patient population with this degree of infirmity and age, the attachment to reality is tenuous. Familiarity of place, people and surroundings is the key or link to orientation and stability. (Testimony of William Goldman, M.D.)

In November 1977, the Department, after surveying the conditions at the Center, concluded that the "Conditions of Participation" for the Medicare and the Medi-Cal Programs were not being met. The Center was informed that after review of the survey report, a follow-up visit report and any comments from the Center, a decision would be made regarding the Center's continued participation in the Medicare and Medicaid programs. The Center's "provider agreement" was extended until January 31, 1978 to allow for review of the grounds for the decision. (Deft.'s Exh. C.)

By letter dated February 6, 1978, the Center was notified by the Department that its provider agreement would not be renewed for failure to meet the standards required for participation in the Medi-Cal Program. (Deft.'s Exh. D.) The letter noted that "Payments to your facility for the care of Medi-Cal beneficiary patients under the present agreement will terminate on the date of their relocation to another facility or April 1, 1978, whichever occurs earlier." In keeping with Judge Low's Interim Order, the Department said it would attempt to extend funding until April 15, 1978.

After the final decision by the Department not to renew the provider agreement had been made, the Center prepared a letter to relatives and other parties responsible for the patients notifying them of the Center's imminent closing. By that letter they were told that a representative of the Department would contact them to arrange a suitable transfer for the patient. (Deft.'s Exh. E.)

The only written notice to patients at the Center was prepared still later in the form of a letter from the Department dated February 21, 1978, to inform patients that as of April 1, 1978, the Medi-Cal Program could no longer pay for their care at the Center and that in order to continue to receive Medi-Cal benefits, they must relocate to another facility as soon as possible. The only explanation for the action was the facility's failure to meet Medi-Cal requirements. (Deft.'s Exh. A.)

The patients were given no official notice of their rights in connection with the nonrenewal of the Center's Provider Agreement. There is some question whether all patients and relatives, in fact, received this letter giving notice of the final decision not to renew the agreement. A social worker for the City testified that she "believed" all patients had received the letter through the mail. (Testimony of Henrietta Gilliamwa-

ter.) At least one relative, however, did not and learned of the planned transfers only through nursing home gossip. (Aff. of Frances Funk.) *In any event, no notice whatever was given to any patient until after the final decision had been made.*

Pursuant to the Department's plan of relocation, the actual patient transfers were to be implemented by the San Francisco Department of Social Services. (Testimony of Ann Miley.) City social workers were to explain and interpret the notice and to find new homes for the patients. The City had dealt with similar populations, but never with such a large group. Although efforts were made, there were problems in placing patients in nursing homes with other patients of their ethnic groups. (Testimony of Henrietta Gilliamwater.)

It should be noted again that to this date, no plan for the closing of the Center and for removal of patients has been approved by the State court. Despite that, the Department engaged in a campaign calculated to get patients out. By March 6, 1978, 97 patients had left the Center. Of the 97, only 46 were placed in facilities in San Francisco; of these 46 patients, six have died. Fifty-one patients were transferred to nursing homes outside of San Francisco. (Aff. of Mary Snyder.)

The atmosphere at the Center in recent weeks has been one of fear and uncertainty. Many patients and their relatives have felt compelled to relocate immediately to other facilities, for fear that come April, they would not only lose their benefits but also have no place to go. Some patients have been moved by desperate friends and relatives without the consent of the treating physician. Numerous specific examples of patients' and relatives' reactions to the impending ordered move can be documented.

Patients and their friends or relatives have been found weeping with fear and distress. (Aff. of Hilary Gordon.) Patients' relatives say they have been told that if available beds are not accepted they would have to care for the patient at home. (Aff. of Hilary Gordon.) Friends and relatives have complained that they will not be able to visit if patients are relocated beyond the reach of public transportation. (Aff. of Nelio Berko; Aff. of Hilary Gordon.) Patients who are relocated outside the City in many instances will be separated from the support of relatives and their personal physicians. (Affs. of Frances Funk, Betty Hammer, Sandra Alto.) In some instances patients have cried and shown signs of depression, following the removal of close friends who had been patients. (Affs. of Hilda Cloud and Mary Ann Tobin.)

In some cases, supportive patient friendships have been undermined even though both patients remain at the Center. Mary H., 83, diabetic and totally blind and Mary B., 85, suffering from two broken hips and chronic alcoholism, developed a close supportive friendship as roommates for a year. As the Center has been depopulated, their floor was closed and they were moved to new rooms, with new roommates, on different floors. Since, their separation, Mary B. has repeatedly called a vocational nurse associated with the Center, expressing her concern about Mary H. and has suffered from continual symptoms of nausea, diarrhea and loss of appetite. Mary H. complains "Why did they separate us? Why did they take my eyes from me?" (Aff. of Colette I. Hughes.)

In another case, the patient did not survive the initial move between floors of the Center. Connie W. was moved to the fifth floor of the Center when the seventh was closed. Immediately following the move she experienced severe loss of appetite accompanied by dehydration. She eventually was moved to an acute care facility suffering from kidney failure, and expired shortly thereafter. (Aff. and Testimony of Harold Sugarman, M.D.)

Another patient, Ellis W., who suffered from advanced cardiovascular disease and diabetes, died just as significant numbers of patients had begun to be moved from the Center. At a time just prior to Mr. W.'s death, a social worker was requesting permission from the treating physician to move him to another facility.

In the professional opinion of their treating physician, the deaths of Connie W. and Ellis W. were causally related to the trauma associated with the ongoing relocation of patients from the Center. (Aff. and Testimony of Harold Sugarman, M.D.)

What caused all this fear, havoc, injury and misery? Was it a war, flood, tidal wave, earthquake or other terrifying Act of God? Not at all. It was the decision of a large State bureaucracy, not unaided by a huge federal bureaucracy, requiring these helpless, elderly patients to move out in a hurry, without reasonable advance notice of that decision so vitally affecting them and without an opportunity to be heard.

Plaintiffs claim that the described consequences of forced removal, or the threat of it, are symptomatic of a phenomenon termed "transfer trauma", characterized by physical and emotional deterioration as well as by increased rates of mortality. While there was some conflict in the evidence on this issue, the Court finds the overwhelming weight, both in volume and credibility, to support plaintiffs.

Plaintiffs presented considerable documentary and testimonial evidence on the causes, nature and prevention of transfer trauma. The basic principle of the phenomenon is the recognition that the transfer of geriatric patients to any unfamiliar surroundings produces an increased rate of morbidity and mortality. (Testimony of William Goldman, M.D.); Aldrich Mendkoff, *"Relocation of the Aged and Disabled: A Mortality Study"*, 11 *Journal of the American Geriatrics Society*, No. 3 at 193; E. Killian, *Effect of Geriatric Transfers on Mortality Rates,* 15 *Social Work*, No. 1, 19–26 (1970); Markus, Blenkner, Bloom & Downs, *Relocation Stress and the Aged*, 7 *Interdisciplinary Topics in Gerontology* 60–71 (1970). Further, the anticipation of relocation can have effects almost as severe as those caused by the actual relocation. Bourestrom and Tars, *Alterations in Life Patterns Following Nursing Home Relocation, The Gerontologist*, No. 2, 506–510 (1964).

One of the most potent factors in producing transfer trauma is the degree of environmental change involved in the move. *Id.* Careful planning and casework in preparation for the patient relocation can facilitate the patients' adjustment to the new surroundings and thereby minimize the effects of transfer trauma. Aldrich & Mendkoff, *supra;* Pablo, *Intra-Institutional Relocation: Its Impact on Long-Term Care Patients,* 17 *The Gerontologist* No. 5, 426–34 (1977).

The most critical aspect of a relocation plan is provision for pre-relocation visits by the patients to the new facility. (Aff. of Dr. Leon Pastalan; Aff. and Testimony of William Goldman, M.D.) Two other important aspects of a relocation plan are: (1) matching the new environment with the old in terms of size, community, ethnicity, social and medical programs, location; and language groups; and (2) maintaining patient support systems by transferring as a group artificial kinship groups formed at the current facility and by maintaining reasonable proximity to friends and family in the community. (Aff. of Dr. Leon Pastalan.)

Plaintiffs contend that in view of their extreme age and frailty, such a plan is essential to their well-being if relocation is carried out. Moreover, they claim that the relocation plan (Aff. of Ann Miley) devised by the Department is grossly inadequate to meet their needs. (Testimony and Aff. of William Goldman, M.D.)

The Department on the other hand maintains that the greatest risk to the patients upon their relocation to new surroundings is not an increase in their rate of morbidity and mortality but the peril of traffic accidents during the move. (Testimony of Robert Pierce, M.D.) The Department further maintains that while the absence of pre-relocation visits to the new facility, the distance of the new home from the old, and the severing of friendship bonds may have a deleterious effect on the patients, that effect is not serious. In sum, the Department maintains as a factual matter, that patients similar in characteristics and number to

those at the Center can be safely transferred, during a two week period, to new facilities without the elaborate precautions insisted upon by plaintiffs.

With all due deference to the expertise of the Department, the Court as trier of fact does not find the Department's evidence on the effects of transfer trauma to be at all persuasive. Rather, the Court finds that the relocation of plaintiffs, as presently contemplated by the Department, presents a substantial danger to their health and well-being.

The evidence was also in conflict with regard to the question of the condition of the physical plant and of the quality of medical care at the Center.

In attacking the adequacy of the physical plant of the Center, the Department relies heavily on decisions and supporting documentation in *California v. Post Street Convalescent Hospital, Inc.*, No. 718–459 (Super.Ct. SF Co.1977); *In re Post Street Convalescent Hospital, Inc.*, No. 76–88 N 8752 (Cal.Dept. of Health 1977). While these decisions and the supporting materials specify numerous violations of the California Health and Safety Code, few of the cited deficiencies related to the structure of the facility. The focus of the aforesaid actions was primarily on administrative improprieties, improper hygienic procedures, and inadequate nursing care. Serious as these matters may be, they do not reflect on the condition of the building's physical plant.

The Department does make several specific allegations with respect to the physical plant of the Center. The kitchen is criticized as inadequate in size and arrangement for a patient population of 325. (Aff. of Ardene Nakagawa; Decl. of Pamela McCoy.) However, considering the present patient population of 150, the kitchen could be considered adequate. (Testimony of Margaret Devoir.)

The ventilation system is described by the Department as "barely adequate". (Aff. of Stanley C. Roman.) However, other evidence shows that the ventilation system requires only testing, adjusting, and minor modifications, such as additional dampers.

(Engineering Rept. of Rowan C. Brooks; Testimony of Margaret Devoir.)

While the Department complains that the elevators are too few for a seven story, 396 bed facility (Aff. of Stanley C. Roman) and have inadequate safety mechanisms (Decl. of Stanley C. Roman), such evidence must be weighed in the context of the facility's present operation on 3 floors with 150 patients. Further, there is evidence that the elevator safety mechanisms have been repaired. (Testimony of Margaret Devoir.)

There is also evidence that the Center has a problem with rodent infestation. (Decl. of Stanley C. Roman.) Steps to correct this problem have been taken by adding metal flashing to the doors and by repairing screen doors. While additional permanent measures may be necessary to close rodent holes, temporary measures have been taken to block them. (Aff. of George Bush.) Temporary repairs have also been made to a leaking area of the roof. (*Id.*)

On the plus side of the ledger, there is substantial evidence that the Center possesses valuable assets in terms of its use as a patient care facility.

The rooms are large, well-lighted, and sunny. The T-shaped floor layout is good and the location across from a park provides a pleasant environment for the patients. (Aff. and Testimony of Dr. Lorraine Smookler.) Also, the treating physicians have indicated their satisfaction with the physical plant, describing it as bright, cheerful and close to patients' families, and noting nothing substantially wrong with the physical plant. (Affs. of Harold Sugarman, M.D. and L. Bender, M.D.; Testimony of Margaret Devoir and Sheldon Weiss, M.D.) Finally, there was evidence that the patients themselves are satisfied with the physical plant. (Testimony of Margaret Devoir.)

The decisions and supporting documentation in *California v. Post Street Convalescent Hospital, Inc., supra,* and *In re Post Street Convalescent Hospital, Inc., supra,* do show serious failings in the area of hygiene and patient care in the past history of the

Center. During the survey of the Center in November 1977, the Department discovered continued violations of health care regulations due in part to inadequate staffing. In particular, the Department alleges a general lack of cleanliness (Decl. of Stanley C. Roman); deficiencies in dietetic service, especially the failure to follow regular and therapeutic diets and to prepare food palatably; and the failure of nursing staff to assess patient needs and significant changes in patients' conditions, to notify the physician of the same, and to promptly implement physicians' orders. (Decls. of Pamela McCoy, Laura Mae Koette, Charles H. Goede, Yvette Barriere, Ursula Borgman, Elizabeth F. Sprowles.)

These violations do have serious implications for the health and safety of the patients. However, there is persuasive evidence, presented by the Department itself that the patient care conditions at the Center have undergone a substantial improvement.

A March 6, 1978 visit to the Center by a nursing consultant to the Department revealed that patients were clean and dressed (though some were not properly positioned in chairs); that patients were being assisted with feeding as necessary; that a technician had been called to repair the kitchen freezer thermometer, the condition presenting no immediate danger; that there was an adequate food supply; and that regular and therapeutic diet menus were being followed. There was adequate staffing and general cleanliness, although improper handling of soiled linen and the failure of kitchen employees to cover hair and street clothes remained problems. (Aff. of Mary Snyder.)

A March 13, 1978 visit, by Ann Wallace and William H. Isaac, revealed adequate nursing care; that patients were clean, groomed and dressed; that no gross negligence was evident; that there were adequate supplies of clean linen; and that cleanliness of patient areas was adequate. Improper handling of soiled linen remained a problem at one end of one floor. Another criticism was the lack of dietary personnel coupled with the suggestion that the services of a food service company be retained. (Aff. of Mary Snyder.) There also was evidence that the patients and their friends and relatives were satisfied with the quality of care at the Center. (Aff. of Pamela Stevens.)

Thus, although there remain managerial problems to be resolved at the Center, there has been a substantial improvement leading the Department's own consultants to conclude that the nursing care is adequate. The Court finds that the present condition of the physical plant and the present quality of nursing care at the Center do not present a substantial danger to the health and well-being of the patients.

Throughout this proceeding the Court has had to deal with the pressing deadline of midnight April 1, 1978, the date upon which federal and state Medi-Cal payments were threatened to cease. Thus, although the Court may have desired additional time to receive oral testimony or to consider the evidence and legal arguments already presented, the urgency created by the impending cut-off of state and federal funds compelled an immediate decision.

The Court specifically requested counsel for the Department to determine whether the Department would be willing to maintain the status quo, i. e., maintenance of adequate levels of care at the Center. However, the Department declared its unwillingness to maintain the status quo for more than about three days. The Department took this position even though that status quo was essential to the preservation of this Court's power to render a meaningful decision on the merits, even of this motion for a preliminary injunction, let alone the merits of plaintiffs' claims for final adjudication of federal statutory and Constitutional rights.

## V. Legal Issues.

### Jurisdiction

█ Plaintiffs' attack on the closing of the Center and the reclassifications and relocations associated therewith is based upon

federal statute and regulation. Plaintiffs have individually alleged claims of potential injury to their physical and mental health exceeding $10,000, as well as deprivation of their civil rights. Thus, plaintiffs have properly invoked the federal question jurisdiction of this Court pursuant to 28 U.S.C. § 1331. *See Ostrow Pharmacies, Inc. v. Beal,* 394 F.Supp. 22, 24 (E.D.Pa.), *aff'd,* 527 F.2d 645 (3d Cir. 1976).

Plaintiffs' allegations of the deprivation under the color of state law, of rights secured by the Constitution, establish an independent basis for federal jurisdiction. 42 U.S.C. §§ 1983, 1396a et seq., 28 U.S.C. §§ 1343(3) and (4). *See Blue v. Craig,* 505 F.2d 830 (4th Cir. 1974); *Wilczynski v. Harder,* 323 F.Supp. 509 (D.Conn.1971); *Bass v. Rockefeller,* 331 F.Supp. 945, 949 n. 5 (S.D.N.Y.1971).

*Eleventh Amendment*

 The Department has taken the position that it is beyond the power of this Court to order them to pay any sums of money for the future maintenance of the Center. It grounds its objection in the Eleventh Amendment to the United States Constitution which provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

By its terms, the Amendment only prohibits suits undertaken against a State by citizens of other States, or by citizens of foreign states. However, it has long been settled law that the Eleventh Amendment also prohibits suit against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

While a State cannot, without its consent, be subject to suit in the federal courts, that is not true of state officers. As long ago as *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), it was held that the Eleventh Amendment did not protect state officers from suit in federal court for violation of federally protected rights. Nor did the Eleventh Amendment prevent a federal court from ordering relief which indirectly operated against the state through the court's jurisdiction over its officers. *Ex parte Young, supra.*

The distinction drawn by the Supreme Court in *Ex parte Young,* between suits against a state and suits against its officers, was recently reaffirmed in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In reaffirming *Ex parte Young,* however, the Supreme Court also limited the options available to the federal courts in suits involving state officers. Where the relief contemplated consisted of money damages for breach of a past duty, or the equivalent, such relief was barred by the Eleventh Amendment even if the suit was brought against an officer of a state and not the state itself. In so holding, the Supreme Court took care to indicate that it was not barring all forms of relief which involved imposition of a monetary obligation upon a state. Mr. Justice Rehnquist, writing on behalf of the Court, stated:

The injunction issued in *Ex parte Young* was not totally without effect on the State's revenues, since the state law which the Attorney General was enjoined from enforcing provided substantial monetary penalties against railroads which did not conform to its provisions. Later cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in *Ex parte Young.* In *Graham v. Richardson,* 403 U.S. 365 [91 S.Ct. 1848, 29 L.Ed.2d 534] (1971), Arizona and Pennsylvania welfare officials were prohibited from denying welfare benefits to otherwise qualified recipients who were aliens. In *Goldberg v. Kelly,* 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287] (1970), New York City welfare officials were enjoined from following New York State procedures which authorized the termination of benefits paid to welfare recipients without prior hearing. But the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which

by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young, supra.*

*Edelman,* 415 U.S. at 667–68, 94 S.Ct. at 1357.

*Edelman v. Jordan* itself provides the refutation of the Department's argument. The relief ordered by this Court is clearly not the equivalent of a judgment for money damages. Rather, it is prospective relief calculated to protect the federal rights of the residents of the Center.

Nonetheless, the Department argues that no money is available under state law for the maintenance of the Center in accordance with this Court's orders. The answer to this contention was well made by the United States Court of Appeals for the Eighth Circuit:

> The obligation of defendants to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what the defendants may be able to accomplish with means available to them. As stated, if [the state] is going to operate institutions like [the mental institution at issue], their operation is going to have to be consistent with the Constitution of the United States.

*Welsch v. Likins,* 550 F.2d 1122, 1132 (8th Cir. 1977), citing *Holt v. Sarver,* 309 F.Supp. 362, 385 (E.D.Ark.1970), aff'd 442 F.2d 304 (8th Cir. 1971). *Accord, Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974). *See also Watson v. City of Memphis,* 373 U.S. 526, 537, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963).[4] In *Welsch,* the Eighth Circuit affirmed a

district court order enjoining enforcement of the fiscal control provisions of the Minnesota Constitution so as to enable the defendant state officials to pay for the relief ordered by the district court. While *Welsch* did not specifically deal with the Eleventh Amendment issue of *Edelman v. Jordan,* a subsequent Eighth Circuit decision expressly held that *Welsch* was not inconsistent with *Edelman. MacBride v. Exon,* 558 F.2d 443 (8th Cir. 1977).

The Department's broad reading of *Edelman* is decisively refuted by the Supreme Court's recent opinion in *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). In *Milliken,* the Supreme Court affirmed an order of the district court which, *inter alia,* compelled the State of Michigan to pay for the purchase of school buses as part of a court-ordered desegregation plan. The Court found the situation in *Milliken* to be an example of relief impinging upon a state treasury permissible under *Edelman, supra.* The relief contemplated by this Court does no more than that approved in *Milliken.*

■ The Department also argues that it is under no obligation to maintain the Center, and thus cannot be compelled to maintain it according to federal standards. Implicit in this argument is a proposition long repudiated by the federal courts. Once the state has assumed to undertake a matter, it is obligated to act in manner consonant with federally protected rights. It matters not that the conferral of benefits was voluntary, rather than a matter of obligation. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). So long as the state has acted to give the Center residents a legitimate expectation of continued residency, it cannot deprive them of that expectation except in accordance with applicable federal stan-

4. It could be argued that enforcement of federal statutory rights, as opposed to federal constitutional rights, requires a greater sensitivity for the state fisc. Such an argument overlooks the fact that a state is constitutionally compelled to respect a federal law and valid regulations promulgated thereunder. See U.S.Const. Art. VI; *Bourgeois v. Stevens,* 532 F.2d 799, 802 (1st Cir. 1976); *Ranjel v. City of Lansing,* 417 F.2d 321, 322–323 (6th Cir. 1969), cert. denied, 397 U.S. 980, 90 S.Ct. 1105, 25 L.Ed.2d 390 (1970).

dards. *Perry, supra; Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Klein v. Mathews,* 430 F.Supp. 1005, 1009 (D.N.J.1977). Such an expectation exists here by virtue of the Department's having certified the Center in accordance with applicable federal regulations. *Klein, id.*

### Abstention

 The Department has also argued that, assuming there are federal questions to adjudicate, this Court should abstain in favor of the proceedings now pending in the Superior Court of the State of California for the City and County of San Francisco. It invokes the "abstention doctrine", as defined by *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).[5]

 This Circuit has developed a test for determining the applicability of *Pullman* abstention. *Rancho Palos Verdes Corp. v. City of Laguna Beach,* 547 F.2d 1092 (9th Cir. 1976). *Rancho Palos Verdes* established three criteria to be considered by the district court:

> (1) The complaint "touches a sensitive area of social policy upon which federal courts ought not to enter unless no alternative to its adjudication is open."
>
> (2) "Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy."
>
> (3) The possibly determinative issue of state law is doubtful.

*Id.* at 1094, quoting *Canton v. Spokane School Dist. No. 81,* 498 F.2d 840, 845 (9th

Cir. 1974). It is the conclusion of the Court that the instant action is not one appropriate for abstention on the basis of the test set out in *Rancho Palos Verdes, supra.*

It is true that the treatment of the elderly can fairly be deemed "a sensitive area of social policy", thus satisfying the first criterion of *Rancho Palos Verdes.* However, it is by no means clear that the action in the San Francisco Superior Court can definitively resolve the present controversy. At issue in the state court proceeding is the operation of the Center without a license, and the framing of a suitable relocation plan for Center residents. While this Court does not question the capability or good faith of the Superior Court in adjudicating this matter, plaintiffs are not parties to the Superior Court action. Therefore, plaintiffs' claim to notice, hearing, and a relocation plan meeting their medical and psychosocial needs, *as a matter of federal right,* is not before the Superior Court. Moreover, the Preliminary Injunction issued by this Court, in no way precludes, nor interferes with, any proceeding in the Superior Court.

> Nothing in this preliminary injunction precludes any party or person from bringing, maintaining, participating in, intervening in or otherwise proceeding in any state court in any action therein now pending or hereafter initiated. Nothing herein enjoins or otherwise interferes with any ruling, order, judgment or other action of any court of the State of California.

Appendix C at 4.

The provision of notice, hearing and a relocation plan meeting plaintiffs' needs under the aegis of the Superior Court, is not inconsistent with the terms of the Preliminary Injunction. Any alleged confusion or

---

**5.** While not raised by the State defendants, the Court has also considered the applicability of abstention under the doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Younger* abstention applies when the federal plaintiff had or has the opportunity to raise a federal claim in a prior or concurrent state court proceeding. While the origins of *Younger* abstention are to be found in criminal cases, the doctrine was recently extended to civil litigation involving the state in its sover-

eign capacity. *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). *Younger* abstention is clearly inappropriate here. While plaintiffs sought to intervene in the state court proceeding, their motion for intervention was denied. Thus they lack one essential element of *Younger* abstention—the opportunity to adjudicate their federal claim in a state forum.

potential conflict resulting from orders of the Superior Court may be resolved by application for modification, enlargement or vacation of the Preliminary Injunction.

Finally, there is no doubtful "possibly determinative issue of state law" before this Court, the third criterion of *Rancho Palos Verdes.* The state licensing procedure for provision of care to the elderly is clear. No one contends that the Center, as *previously* operated by Quality Care, met state standards. Moreover, the underlying regulatory structure and the rights which plaintiffs claim are primarily of Constitutional and federal statutory, not State, origin:

 Nor is *Burford* abstention appropriate. In *Burford,* the State of Texas had established an elaborate regulatory system for the conservation of oil and gas in the state. Jurisdiction to review state administrative orders was vested in a single county court to foster expertise in what was regarded as an exceedingly complex administrative system. Federal courts attempting to construe the relevant Texas law found themselves hopelessly immersed in an administrative morass, and often acted in direct conflict to interpretations of the courts of Texas regarding state law. Under those unique circumstances, the Supreme Court held that the federal courts should defer to state expertise and refrain from exercising their jurisdiction.

There is no similar state administrative structure before this Court. Nor is jurisdiction to review administrative orders conferred on a tribunal of special expertise. This latter fact alone was decisive of the *Burford* abstention claim in *Rancho Palos Verdes, supra.* 547 F.2d at 1096. Accordingly, this Court has not abstained from the exercise of its jurisdiction.

*Medicaid Program*

At the heart of this dispute is the joint state-federal program known as Medicaid, 42 U.S.C. §§ 1396 et seq., 1396a. The purpose of Medicaid is to enable each state to furnish medical assistance to aged and disabled persons whose income and resources are insufficient to meet the necessary costs of necessary medical services. 42 U.S.C. § 1396. *See* 1965 U.S.Code Cong. and Admin.News, p. 1943. Through the Medicaid Program, the federal government reimburses the State of California for a percentage of the latter's expenditures for medical services to eligible recipients by qualified providers. The primary administrator of the program in California is the Department which administers the program in accordance with a state implementation plan required by 42 U.S.C. § 1396a(a). It is the state's responsibility to determine whether a provider of services is qualified to participate in the Medicaid Program under the applicable federal standards. 42 U.S.C. § 1396a(a)(33)(B). A provider who fails to comply with the applicable standards of participation cannot be certified, and thereby loses "qualified provider" status. 42 U.S.C. §§ 1396a(a)(5), (23), (28).

Federal funds may be paid only on behalf of individuals receiving services from a "qualified provider". 45 C.F.R. § 249.-10(b)(4)(i)(C) (1976).[6] *See also* 45 C.F.R. §§ 249.33(a)(1), (4), (6), (10) (1976); 42 U.S.C. §§ 1396a(a)(23), (28) (Supp.1977). Subject to certain conditions, however, the State agency may continue to claim Federal financial participation in payments on behalf of eligible individuals for services furnished by such an institution during a period not to exceed 30 days. 45 C.F.R. § 249.10(b)(4)(i)(C), *supra.* There is no provision for further federal funding, even in the event the state is unable to relocate patients to a facility operated by a qualified provider during that 30 day period. *See id.* With respect to the Center, that 30 day period expired April 1, 1978. Absent the intervention of this Court, the Medicaid beneficiaries at the Center will no longer receive benefits, but would have to suffer transfer to another facility in order to do so.

---

**6.** 45 C.F.R. Part 249 has been recodified as 42 C.F.R. Part 449. 42 Fed.Reg. 52826–7 (Sept. 30, 1977). Since the recodification is not generally available in print the prior codification is cited herein.

■ Medicaid recipients have a right to a hearing prior to any state action resulting in the suspension, reduction, discontinuance or termination of assistance 45 C.F.R. 205.-10(a)(5). Pending such a hearing, federal financial participation continues. 45 C.F.R. § 205.10(b)(1). Decertification of a facility is action within the scope of 45 C.F.R. § 205.10(a)(5). *Klein v. Mathews, supra* at 1007; cf. *Hathaway v. Mathews,* 546 F.2d 227 (7th Cir. 1976) (nursing home operator entitled to notice and hearing prior to termination by HEW); *Paramount Conv. Center, Inc. v. Department of H. C. S.,* 15 Cal.3d 489, 496–97, 125 Cal.Rptr. 265, 269, 542 P.2d 1, 5 (1975) (purpose of regulations is to benefit and protect the patients). The purpose of government-supported health programs is to provide the recipients with qualified health care facilities. Thus, one purpose of the notice and hearing provision would be to benefit and protect the Medicaid recipient. *See id.*

### Standard for preliminary relief

■ To qualify for a preliminary injunction, plaintiffs must raise serious questions going to the merits of the litigation and demonstrate a balance of hardships tipping sharply in their favor. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86 (9th Cir. 1975). Plaintiffs have raised such questions and demonstrated the requisite balance.

### Reclassification

Plaintiffs claim that the Department has reclassified the level of health care needed by as many as forty-four patients at the Center. The reclassifications effected a determination by the Department that those patients required a level of care lower than skilled nursing care. The attending physicians did not concur in the proposed reclassifications, which may result in the reduction of medical benefits received by the patients. Under the regulations applicable to the Medicaid Program, before a state may reduce an individual's medical assistance, it must give that patient notice and opportunity for a hearing. 45 C.F.R. § 205.-10(a)(5).

Since there is no evidence that any notice or opportunity for hearing to contest the reclassifications has been provided, plaintiffs have raised a serious question of violation of federal regulations. It is also clear that the balance of hardships tips sharply in plaintiffs' favor. Plaintiffs are dependent on Medicaid benefits for their daily care. Any interruption in the flow of those benefits could have serious, permanent consequences for their physical and mental health. The Department, on the other hand, is faced only with administrative and fiscal consequences.

Further, a failure by the Department to comply with the provisions of 45 C.F.R. § 205.10(a) imperils plaintiffs' entitlement to any continued federal funding and therefore plaintiffs' benefits. 45 C.F.R. § 201.6. Thus plaintiffs are clearly entitled to preliminary relief. Indeed, the Department has conceded the validity of plaintiffs' claim for notice and hearing with regard to reclassification.

### Relocation

Plaintiffs contend that the Department's actions in decertifying the Center as a provider of Medi-Cal/Medicaid benefits without prior notice and opportunity for hearing violated their Fourteenth Amendment due process rights. The thrust of plaintiffs' due process argument is that the extension of benefits in the nursing home area creates in plaintiffs an interest in continued occupancy cognizable under and protected by the due process clause. Plaintiffs also point out that under federal regulations a nursing home patient may be "transferred or discharged only for medical reasons, or for his welfare or that of other patients, or for nonpayment for his stay . . ." 20 C.F.R. § 405.1121(k)(4); 45 C.F.R. § 249.-12(a)(1)(ii)(B)(4). They contend that this regulation also vests the patients with a property interest in their continued occupancy at the Center. Plaintiffs' constitutional arguments appear to be valid. *See Klein v. Mathews,* 430 F.Supp. 1005, 1009 (D.N.J.1977).

In addition to their Constitutional claims, plaintiffs contend that 45 C.F.R. § 205.10(a) requires that they be accorded notice and opportunity for hearing prior to their relocation. This regulation requires that a recipient of Medicaid benefits be accorded notice and opportunity for hearing prior to any Department action resulting in a reduction of assistance. The Department does not deny that in the history of the Center, no resident of the facility has received such notice and opportunity for hearing.

Rather the Department contends that plaintiffs will suffer no reduction in benefits upon transfer to another certified facility. Moreover, the Department contends that notice and hearing would serve no useful purpose since all parties admit that the Center as operated by Quality Care has not been in compliance with state or federal standards.

Plaintiffs also claim that they have a right to a relocation plan meeting their total medical and psychosocial needs. 20 C.F.R. 405.1121(1). The Department has not denied its obligation to accomplish any necessary transfer of the plaintiffs in an orderly and humane manner. A proposed relocation plan is currently under consideration by the Honorable Harry W. Low in Superior Court No. 731–253. Plaintiffs dispute the adequacy of that plan. In view of the age and infirmities of the patients, the number of patients to be relocated, the distances patients will be moved, and the time frame contemplated, plaintiffs' objection appears to be well taken.

The Department's action presents the specter of precipitous and involuntary mass transfer of plaintiffs from the Center to numerous other facilities scattered throughout the Greater Bay Area. Many patients would be separated from friends at the Center as well as from other friends, family, and their personal physicians. The trauma that such a dislocation would cause many if not all the plaintiffs is well-documented. See pp. 444–445, supra. The damage to individuals in terms of physical and emotional deterioration, and increased mortality incidence as a result of "transfer trauma" has been recognized by the federal courts. See e. g., Hathaway v. Mathews, 546 F.2d 227, 231 (7th Cir. 1976); Klein v. Mathews, 430 F.Supp. 1005, 1009 (D.N.J. 1977); Burchette v. Dumpson, 387 F.Supp. 812, 819 (E.D.N.Y.1974).

There is no doubt that the relocation of plaintiffs will work a grievous loss upon them. Aside from the physical and emotional danger presented by the "transfer trauma" syndrome, the evidence shows that the plaintiffs will suffer a serious disruption in their personal lives. Such trauma and loss may well, in itself, constitute a reduction of benefits triggering the notice and hearing requirements of 45 C.F.R. 205.-10(a).

The Court cannot accept the Department's argument that notice and hearing would serve no useful purpose. In Klein, the Court described one aspect of the patients' role in hearings under 45 C.F.R. 205.-10(a):

> While the court is deferential to the expertise of HEW, it is rank paternalism to suggest that patients who live in a facility, who have firsthand knowledge of the conditions, who are best equipped to describe how that facility has served them, cannot contribute to the process by which it is determined whether the facility meets federal standards. The court finds it hard to understand how HEW can seriously argue that the very patients whom HEW seeks to protect can have no purposeful role with respect to the condition of their environment. *Considering the grievous loss termination of federal financial participation causes, and the patients' firsthand knowledge of the facts concerning the care provided, the court believes the patients' role in determining the facility's compliance is crucial.*

Klein, supra at 1011 (emphasis added). In addition, the patients could play an equally purposeful and crucial role in the formulation of a plan for their relocation to other facilities.

The Department contends that Klein has no application or precedential value with respect to the facts of this case.

*Klein v. Mathews, supra,* 430 F.Supp. 1005 (D.N.J.), involved a decision by HEW to terminate financial assistance to a New Jersey nursing home. The basis for Hew's decision was that the home was no longer a qualified Medicaid provider, and was therefore ineligible for Medicaid assistance. The State of New Jersey and the Medicaid residents of the nursing home challenged the decision in the district court.

In an opinion by Judge Brotman, the district court held that the residents of the nursing home had a constitutional right to a hearing prior to the cutoff of federal assistance. The court held that the applicable federal regulations gave the residents a legitimate entitlement to continued occupancy in a complying facility. *Id.* at 1009. The court held that this regulatory entitlement rose to the dignity of a property right, thereby obligating HEW to give the residents procedural due process before moving them to another institution. *Id.* The court found support in cases holding that the due process clause applied simply as a consequence of a governmental decision to confer benefits such as public or quasi-public housing or utility services. In light of its holding, the court found it unnecessary to consider whether relocation of the patients would also constitute a denial of Medicaid benefits, due to the lack of qualified providers to which the residents could be relocated.

In addition to its finding of a property interest in continued residency, the court also held that an involuntary transfer constituted a reduction of benefits, thus independently triggering considerations of due process. Such a reduction occurred due to the well-documented phenomenon of "transfer trauma". The court found that the change of surroundings and movement over long distances necessitated by a transfer aggravated existing infirmities and significantly increased the likelihood of early mortality. Having determined that the pa-

tients were entitled to due process, the court then considered what process was "due".

The court determined that the appropriate form of due process was a pre-termination evidentiary hearing, citing *Goldberg v. Kelly, supra.*[7] The court was concerned that a deprivation of medical services, even of a temporary nature, deprived the patients of a "life sustaining" benefit, as in *Goldberg,* and one that could not be compensated for *ex post facto.* The court examined the interest HEW had in avoiding pre-termination hearings, and held that HEW's interest was insufficiently pressing absent emergency circumstances threatening the health of the residents. The court noted that· the HEW decision to cut off Medicaid funds, and the concomitant determination that the services at the facility were inadequate, were sharply disputed. The court found the interest asserted by HEW in termination and relocation particularly unimpressive when the residents themselves were seeking a hearing, rather than the financially-interested provider.

HEW, in its amicus curiae brief, disputes the applicability of *Klein* to the instant case. The basis for HEW's distinction of *Klein* is that here, unlike *Klein,* an emergency situation exists. Evidence of such an emergency, it asserts, can be found in the unanimity of all concerned that the Center does not meet federal standards, a sharply disputed question in *Klein.* Moreover, Quality Care, unlike the institution involved in *Klein,* has no interest in continuing in operation. While these are indeed factual distinctions, they are far from decisive ones.

First, the "emergency" contemplated in *Klein* clearly would involve a situation where the health and welfare of the residents were actually endangered, an exigency justifying precipitous removal of the residents without due process. There is no such emergency here. Conditions at the

7. The *Klein* Court considered and rejected as unpersuasive the contrary result in *Nicobatz v. Weinberger,* CCH Medicare and Medicaid Guide, par. 27, 427, 1975 Transfer Binder at 9827 (C.D.Cal.1974). The *Nicobatz* court did not deal with the impact of transfer trauma, transfer as a reduction of benefits, or the difficulty of relocation where there is a shortage of available beds. *Klein, supra* at 1012.

Center have improved markedly of late, and will remain at the improved level as a consequence of the orders of this Court. That Quality Care may no longer wish to provide the requisite services also presents no emergency. It is within the power of this Court to require the State of California to provide the necessary services.

Second, as in *Klein,* it is the patients who have invoked the jurisdiction of this Court. The Department's cries of emergency ring hollow in light of the desire of those actually facing the alleged emergency to remain in the Center.

Third, in determining what process is constitutionally "due", the effects of transfer trauma, documented both in this case and in *Klein,* raise a weighty consideration in favor of pre-termination hearings. The administrative convenience of relocating residents before the presently scheduled cutoff of Medicaid funds, and the withdrawal of Quality Care, does not justify endangering the health of Center residents by precipitous action.

In essence, the Department's argument is that this Court should ignore considerations of due process by permitting the situation to so deteriorate that an emergency exists. This is an entirely different situation than the emergency contemplated in *Klein,* hypothesizing a case in which the court would have had no opportunity to act before confronting the emergency.

Thus, plaintiffs have again met the burden of raising substantial questions going to the merits of this litigation. The balance of hardships is also clearly in plaintiffs' favor. If plaintiffs are transferred from the Center, any constitutional or statutory right to prior notice and hearing and to a proper relocation plan—rights which they may later be adjudged to have—would be rendered meaningless. Unless plaintiffs are granted preliminary relief to maintain the status quo, the power of this Court to render effective relief will be defeated.

*Relief*

▮ Plaintiffs request the Court to appoint a receiver to operate the Center pending transfer of operation of the Center to new, duly certified providers, transfer of the residents to other facilities according to a proper relocation plan, or the final adjudication of plaintiffs' claims.

Although a receivership is usually imposed to supervise a distressed business, *pendente lite,* it has also been used to protect and preserve important rights of interested parties. In *Morgan v. McDonough,* 540 F.2d 527 (1st Cir. 1976), the court upheld the appointment of the City Superintendent of Schools as receiver to administer a court-ordered school desegregation plan. Such direct intervention, though undesirable, was approved as the "only reasonable alternative to non-compliance with a court's plan of desegregation". *See also Turner v. Goolsby,* 255 F.Supp. 724 (S.D.Ga.1966) (State School Superintendent appointed to protect constitutional right to attend a desegregated school).

Receiverships have also been used to protect the rights of nursing home patients. In *Toler v. Lula Toler Convalescing Home,* 236 Ark. 24, 364 S.W.2d 680 (1963), the trial court on its own motion appointed a receiver to operate a nursing home when a controversy over management control resulted in the withholding of state welfare payments. In affirming the appointment the Arkansas Supreme Court stated:

> If the Court had failed to appoint a receiver in 1958 in all probability the Home would have failed and its sixty odd patrons would have been thrown upon the community. Grasping for control of substantial monthly payments should not be permitted to injure patrons who were wholly dependent upon the welfare payments.

Similarly in *Fields v. Berger,* Index No. 42206/75 (N.Y.Sup.Ct., N.Y.Cnty.1975) and in *Van Ness v. Shore Manor Ltd.,* No. C.3987–75 (N.J.Super Ct., Atl.Cnty.1976) the need to protect elderly patients who were the intended beneficiaries of the Medicaid Program resulted in the appointment of receivers by consent. In *Fields,* the Jewish Home and Hospital for the Aged, a

private charity, agreed to operate the subject facility under an 18-month receivership pending development of a permanent solution. In *Van Ness* the parties accepted a consent decree appointing a state supervisor receiver for 180 days for the purpose of bringing the facility up to state and federal standards.

*Toler, Fields* and *Van Ness,* while persuasive, differ from the instant case in two major respects: Consent and financing. The management dispute in *Toler* puts that case in the traditional context of a business in distress. The question of finding a consenting receiver was not raised. The very dispute over management control raises the inference that sufficient funds were available to operate the Home. In both *Fields* and *Van Ness,* the receivership was imposed with the consent of all parties.[8] In the instant case, however, no consenting receiver has appeared. Furthermore, the inadequacy of the present flow of Medi-Cal/Medicaid benefits to sustain the operation of the Center is a critical aspect of the controversy.

While the appointment of a receiver is within the equity powers of the federal court,[9] it is an extraordinary step warranted only by the most compelling circumstances. In the school desegregation cases, noted above, involuntary receiverships were warranted by school officials' blatant disregard of court orders. The Department, on the other hand, appears to have carefully obeyed the several orders of this Court since the institution of this action. At this time, there is no reason to conclude that the Department will not obey the Preliminary Injunction.

In other cases a preliminary injunction has sufficed to prevent the reclassification of the level of care or the involuntary discharge of nursing home patients pending a final determination of their rights. *See e. g., Yaretsky v. Blum,* No. 76 Civ. 3360 (S.D. N.Y., Jan. 5, 1978); *Mabel Dunn Rest Home, Inc. v. Weinberger,* No 75–0162 (D.R.I., June 5, 1975), 9 Clearinghouse Review 200 (1975–76) (temporary restraining order); *Peterson v. Berger,* No. 75 Civ. 2667 (S.D.N.Y., Dec. 19, 1975), 9 Clearinghouse Review 790 (1975–76) (nursing home operator enjoined from removing patients except pursuant to an agreed plan to be submitted to the court).

Receivership is a remedy of last resort; a receiver should not be appointed if a less drastic remedy exists. *See generally* 75 C.J.S. Receivers § 9 (1952). The Court feels its obligations very keenly in regard to the respective interests of the parties. It is the Court's desire to minimize intrusion upon those functions properly reserved to the State of California. Therefore this Court, while not deciding the question of plaintiffs' right to the appointment of a receiver in any other circumstance, will refrain from the appointment of a receiver at this time.

## VI. Conclusion

When all is said and done, the core question now presented in this case is a simple one. Are plaintiffs entitled to the protection necessary to insure a fair and effective hearing in federal court?

Caught in cross fires of bureaucratic contentions through no fault of their own, plaintiffs present serious claims to a federal court which has legal jurisdiction to hear them—claims grounded in federal law and in the Constitution of the United States. Unless plaintiffs are granted at least the

---

**8.** See also *Carlson v. Morris,* No. 35801 (Wash. Super.Ct., Skagit Cnty., Jan. 13, 1976); 9 Clearinghouse Review 788–89 (1975–76) (Consent judgment calling for notice and hearing regarding reclassification and, in the event transfer is necessary, methods mitigating transfer trauma).

**9.** The Court takes note that legal commentators have endorsed the concept of statutory receiverships to preserve adequate health care facilities. *E. g.* Brown, *An Appraisal of the Nursing Home System,* 17 Ariz.L.Rev. 304, 339–41 (1975); Grad, *Upgrading Health Facilities,* 42 U.Colo.L.Rev. 419, 431–36 (1971). Several states have enacted receivership legislation to clarify the legal remedies under state law to preserve adequate health care facilities. *See, e. g.* N.Y. Public Health Law § 2810 (McKinney Supp. 1975–76). Although such legislation has been introduced in the California State Legislature, it has not yet become law.

protective temporary relief of a preliminary injunction, they will suffer irreparable injury and, for all practical purposes be denied a meaningful day in federal court. Absent that relief, the federal trial court itself (as well as any reviewing federal court) will be precluded from making an effective decision on justiciable issues properly presented.

A Preliminary Injunction in this case has been issued as per the copy appended as Exhibit C.

The Court having conducted a hearing on plaintiffs' application for a preliminary injunction on March 28 and 29, 1978, having considered all the evidence presented at the hearing and the briefs, affidavits, supporting exhibits, and arguments of the parties, and having issued its oral decision and written order on March 29, 1978, granting plaintiffs' application for a preliminary injunction, makes the above findings of fact and conclusions of law.

## APPENDIX A

### TEMPORARY RESTRAINING ORDER

This cause came on for hearing on Plaintiffs' Complaint and Motion, and the affidavits and evidence submitted therewith, and it appearing to the Court that Defendant is committing acts and is about to commit acts as set forth in Plaintiffs' First Amended Complaint and supporting documents, and will continue to do so unless restrained by order of this Court, and that immediate and irreparable injury, loss or damage will result to Plaintiffs, in that (a) they are being transferred or threatened with transfer without proper notice or opportunity for hearing, and without a relocation plan, which action may cause trauma, injury to physical and mental health and possible risk to life; (b) some residents have been precipitously reclassified to receive lower levels of care; and (c) residents are being denied free access to knowledge of their rights, now, therefore, it is hereby

ORDERED that Jerome Lackner, M.D., Director of the California Department of Health, his agents, servants, and employees, and all persons acting in his aid, are hereby restrained from, directly or indirectly,

(1) in any manner initiating or continuing contacts with the residents of the San Franciscan Center (hereinafter "the Center") or the families, guardians or friends of the Center's residents, and each of them, if the purpose or effect of such contact is to urge or suggest relocation from the Center, *provided, however*, that such contacts may be made as to any resident if the physician in attendance has certified in writing that such contact will not, in the physician's medical opinion, seriously endanger the life or health of the named resident;

(2) in any manner providing misleading information of any type regarding the possible closing of the Center or the proposed cut-off of State or federal medical benefit payments;

(3) in any manner taking any further steps of any kind to relocate Center residents and from persuading or encouraging Center residents to relocate, *except* when the treating physician of that resident certifies in writing that he or she has personally seen and spoken with the resident, that the resident is competent to make a rational choice as to his or her relocation, and that the resident is in a medical condition and of an emotional state fit and proper to be relocated;

(4) failing personally to serve copies of all such certificates upon Plaintiffs' counsel and to initiate no steps toward the actual relocation of any such resident within twelve (12) hours after service on Plaintiffs' counsel of the copy of certificate or certificates;

(5) failing to make regular inspections and take all steps required by State or federal law to maintain the requisite standards of care at the Center.

Nothing herein enjoins any action taken in good faith in case of genuine emergency to protect any resident against risk of injury or death such as, for example, fire in the premises, or, for another example, determination by a duly licensed physician that a resident must be removed to a hospital for needed care not available at the Center.

Defendant will show cause before this Court in Courtroom 8 at 11:00 A.M. March 16, 1978 why a preliminary injunction should not be issued prohibiting the conduct restrained by this Order. Plaintiff shall serve this Order and all papers in support thereof, as well as in support of the issuance of a preliminary injunction, at or before noon on Wednesday, March 8 and shall, at or before said time, have filed the same in compliance with the Local Rules of this Court. Defendant shall so serve and file all opposing papers at or before noon, March 14, 1978.

This Restraining Order issued at 6:19 P.M. on March 3, 1978.

*SO ORDERED.*

Dated: March 6, 1978.

### APPENDIX B

### ORDER

This Court has previously orally issued a Temporary Restraining Order at 6:19 P.M. on March 3, 1978, the written order being dated March 6, 1978. It appearing to the Court that amendment of that Temporary Restraining Order is necessary to prevent the commission of acts as set forth in Plaintiffs' First Amended Complaint and supporting documents, and that immediate and irreparable injury, loss or damage will result to Plaintiffs in that (a) they are being transferred and threatened with transfer without proper notice or opportunity for hearing and in the absence of a relocation plan, which action may cause trauma and possible risk to life; and (b) attorneys for the residents are being denied free access to their clients in order effectively to protect their rights, now, therefore, it is hereby

*ORDERED* that:

(1) All terms and conditions of this Court's Temporary Restraining Order dated March 6, 1978, and which issued at 6:19 P.M. on March 3, 1978, remain in full force and effect.

(2) Said Temporary Restraining Order is hereby made applicable in all respects to Quality Care Convalescent Homes, Inc.; to Margaret Devoirs and Carol Kehne; and to all of their agents, servants, employees, and all persons acting in their aid. All such persons are hereby restrained and enjoined from failing to comply with said Temporary Restraining Order issued on March 3, 1978 and dated March 6, 1978.

(3) Plaintiffs' attorneys and any of their agents designed by written authority of Plaintiffs' attorneys shall be permitted full and complete access to the San Franciscan Convalescent Center and all parts thereof during all normal visiting hours. They shall be permitted to speak to any of the residents who desire such communication in the residents' rooms or in any other location of the residents' choice in the San Franciscan Center, in privacy, unescorted, and to have access to any resident unless the resident's physician has left a written order stating that the resident may not receive visitors or that, for medical reasons, only named visitors may be received, and a copy of such order is shown in advance to Plaintiffs' attorneys or their designated agents.

It is further *ORDERED* that this Order will expire ten (10) days after entry, unless extended by further Order of this Court. Plaintiffs shall serve this Order and all papers in support thereof as soon as reasonably foreseeable and, waived, not later than at or before noon on Monday, March 13, 1978.

*SO ORDERED.*

Dated: March 10, 1978.

### APPENDIX C

### PRELIMINARY INJUNCTION

It appearing to the Court that the governing standards relating to the granting or denial of a motion for preliminary injunction require granting the motion in this case, that other considerations so requiring include evidence and admissions without substantial contradiction establishing that failure to issue a preliminary injunction threatens to deprive the Court of the power to make an effective determination on the

merits of significant justiciable issues, that the defendant appears to have failed to give the notice and opportunity for hearing to plaintiffs as required by law and the Constitution of the United States in relation to termination of certification of Quality Care Convalescent Hospital Center, Inc., operator of the San Franciscan Convalescent Center, that unless said motion is granted, the health, if, indeed, not the lives of many needy, aged residents of the Center will be put in jeopardy, that upon consideration of the law, the facts, the testimony (in affidavit, documentary and oral form) and the entire record in this proceeding thus far, the Court has concluded that the following preliminary injunction should be and is hereby issued.

IT IS HEREBY ORDERED that, pending the further order of this Court, the defendant, defendant's agents, officers, successors, deputies, servants, employees, instrumentalities, and all persons acting by, through or under them or any of them and all who receive notice of this order are, each and all, ordered, restrained and enjoined as follows:

1. From removing any residents or patients from said Center until after notice and opportunity for hearing has been given to them in compliance with 45 C.F.R. § 205.10 and its subsections and with the requirements of due process, such notice and opportunity for hearing to be approved by this Court after hearing upon application by defendant and notice to plaintiffs of such application;

2. From failing to maintain the Center and to provide for all residents and patients there substantially the same quantity and quality of services as they were provided immediately prior to the filing of this lawsuit, including payment or effective provision for payment of the actual cost thereof.

3. From in any manner initiating or continuing contacts with the residents of the San Franciscan Center (hereinafter "the Center") or the families, guardians or friends of the Center's residents, and each of them, if the purpose or effect of such contact is to urge or suggest relocation from the Center, provided, however, that such contacts may be made as to any resident if the physician in attendance has certified in writing that such contact is not likely, in the physician's medical opinion, seriously to endanger the life or health of the named resident; and, provided, further, that this shall not preclude notice and hearing as specified in Paragraph 1 above.

4. From in any manner providing misleading information of any type regarding the possible closing of the Center or the proposed cut-off of State of federal medical benefit payments;

5. From failing to make regular inspections and take all steps required by State or federal law to establish as soon as feasible, or make provision to so establish, the requisite standards of care at the Center.

6. From failing to permit plaintiffs' attorneys and any of their agents designated by written authority of plaintiffs' attorneys, full and complete access to the said Center and all parts thereof during all normal visiting hours and from failing to permit them to speak to any of the residents who desire such communication in the residents' rooms or in any other location of the residents' choice in the Center, in privacy, unescorted, and from failing to permit them to have access to any resident unless the resident's physician has left a written order stating that the resident may not receive visitors or that, for medical reasons, only named visitors may be received, provided that a copy of such order is shown in advance to plaintiffs' attorneys or their designated agents.

7. No person who is a party to this case or has notice of this preliminary injunction shall in any way, directly or indirectly, act to aid in any violation hereof nor otherwise to subvert its plain purposes and provisions.

Nothing herein enjoins any action taken in good faith in case of genuine emergency, to protect any resident against risk of injury or death such as, for example, fire in the premises, or, for another example, determination by a duly licensed physician that a resident must be removed to a hospital for needed care not available at the Center.

Nothing in this preliminary injunction precludes any party or person from bringing, maintaining, participating in, intervening in or otherwise proceeding in any state court in any action therein now pending or hereafter initiated. Nothing herein enjoins or otherwise interferes with any ruling, order, judgment or other action of any court of the State of California.

If any party to this case in this Court deems it necessary or desirable that a receiver be appointed and a receivership established in the interest of facilitating compliance with this order, the Court will, upon appropriate notice and showing, consider a motion or motions therefor.

The Court retains the power to modify, enlarge or vacate this preliminary injunction at any time in the interest of compliance with the requirements of law and justice.

The Court intends shortly to prepare and file detailed Findings of Fact and Conclusions of Law supplementing those set forth in the preamble to this preliminary injunction.

Dated: March 29, 1978.